**RAFFOLD PROCESS CORPORATION et al.**
**v. COMMISSIONER OF INTERNAL**
**REVENUE.**

No. 4066.

Circuit Court of Appeals, First Circuit.

Jan. 11, 1946.

Robert C. McKay, of Boston, Mass., for petitioners.

Eugene E. Beyer, Sp. Asst. to Atty. Gen., (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, A. F. Prescott, and Muriel S. Paul, Sp. Assts. to Atty. Gen., and J. P. Wenchel, Chief Counsel, and John M. Morawski, Sp. Atty., Bureau of Int. Rev., both of Washington, D. C., on the brief), for respondent.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

These consolidated petitions for review of two decisions of the Tax Court of the United States raise the question of the deductibility from income, personal holding company, and declared value excess profits taxes of advances made by the two petitioning corporations to a third under the following circumstances.

Harold R. Rafton, formerly the owner of a chemical laboratory specializing in prob-lems arising from the use of carbonate fillers in paper, and also the owner of a number of domestic and foreign (European and Canadian) patents covering processes for the use of such fillers, formed the three Massachusetts corporations here involved on November 5, 1928. He formed the petitioner, Rafton Laboratories, Inc., to take over his chemical laboratory, he formed the petitioner, Raffold Process Corporation, to take over and exploit his domestic patents, and he formed Raffold International Corporation, to do the same with his foreign patents. All of the shares of each corporation were issued to Rafton in exchange for the assets which he turned over to it with the exception of two shares in each corporation which were issued to directors for cash. There never have been any transfers of the stock of any of the three corporations.

Annual payments of various fees and charges were required to keep the European patents owned by International alive, and as that corporation had no income at all prior to January 1, 1937, and insufficient income thereafter to meet these payments, they were met by advances from Rafton[1] individually and from the two petitioning corporations. The total advances made by the two petitioners to International up to December 31, 1938, amounted to $9,000, Laboratory's contribution being $3,500, and Process' $5,500. International never succeeded in finding any licensees under its European patents but it carried on active negotiations for their sale until unsettled conditions in Europe preceding the outbreak of the War put an end to such activities. During 1939 it stopped paying the fees and charges required to keep these patents alive and during that year they were forfeited.

In 1936 it secured one licensee under one of its Canadian patents and during 1937, 1938, and 1939 it derived some income from this source. But in the fall of 1939 this licensee changed its plant over to avoid use of the manufacturing practice under which it was licensed and so informed International.[2]

[1] We are not here concerned in any way with the advances made by Rafton personally.

[2] Subsequently on January 2, 1940, it wrote International that its new method of manufacturing "is not, necessarily, a permanent arrangement and it may well be that the practice will revert back to our previous procedure, * * *" and it said "We propose to maintain the Agreement in full force and effect and will make full returns as provided and payments of royalties as and when they may become payable." In fact the licensee did resume manufacturing under its license about May 1, 1940, and con-

Faced with the loss of International's sole licensee, Rafton personally and the two petitioning corporations on December 15, 1939, executed a composition agreement in which they stipulated that they "hereby severally agree with the said debtor that on payment to us respectively of a composition of ten per cent (10%) on the amount of our respective claims against the said Raffold International Corporation as stated below, we will respectively accept same in full satisfaction of our several claims, and give the said debtor a release or other discharge from our several claims accordingly."

This agreement was apparently carried out and each petitioner in its tax return for the calendar year 1939 deducted the difference between the amount owed it by International and the amount it received under the composition agreement as a bad debt. These deductions were later disallowed by the Commissioner on the ground that: "The facts that the Raffold International Corporation in 1939 had charged off its European patents and had received notice prior to December 15, 1939, that the Ontario Paper Co., Ltd., its sole licensee, had taken steps to manufacture in a manner not requiring the further payment of license fees, are held to be insufficient to establish that the indebtedness due you from such corporation, in excess of 10 per cent thereof, was uncollectible when made

the subject of a 'composition agreement', dated December 15, 1939." On appeal the Tax Court sustained the Commissioner and these petitions are for review of the decisions entered accordingly.

The petitioners advance several arguments in support of the deductions which they claimed in their 1939 returns. They say that the amounts by which the advances made by them to International exceeded the sums they received as a result of the compromise agreement are deductible by them either as bad debts or partial bad debts under § 23(k)[3] or as losses under § 23(f)[4] of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 23(k, f), and in addition Process contends that in cancelling the balance of the debt owed it by International it was in substance and effect paying a dividend to Rafton personally and therefore should be allowed a dividends paid credit under § 27(a) (b),[5] (id) and thus a deduction under § 504(a)[6] in computing its income subject to the personal holding company surtax. We do not agree.

■ Clearly the composition agreement of December 15, 1939, effectually put an end to any possibility of collecting the balances of the debts owed by International to the petitioners. Standing alone, however, this agreement does not by any means establish the right of the petitioners to deduct such balances as bad debts, either par-

---

tinued to manufacture under it, so far as the record indicates, through July, 1942. In consequence, it resumed the payment of royalties during those years but by mutual agreement at a lower rate after October, 1941.

[3] "Sec. 23. (As amended by Section 113, Revenue Act of 1943, Public Law 235, 78th Cong., 2d Sess.) Deductions from gross income.

\* \* \* \* \* \* \*

"(k) Bad debts.

"(l) General rule. Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

[4] "(f) Losses by corporations. In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

[5] "Section 27. Corporation dividends paid credit. (a) Definition in general.

"As used in this chapter with respect to any taxable year the term 'dividends paid credit' means the sum of:

"(1) The basic surtax credit for such year, computed as provided in subsection (b);

\* \* \* \* \* \* \*

"(b) Basic surtax credit. As used in this chapter the term 'basic surtax credit' means the sum of:

"(1) The dividends paid during the taxable year, increased by the consent dividends credit provided in section 28, and reduced by the amount of the credit provided in section 26(a), relating to interest on certain obligations of the United States and Government corporations."

[6] "Section 504. Undistributed subchapter A net income.

"For the purposes of this subchapter the term 'undistributed subchapter A net income' means the subchapter A net income (as defined in section 505) minus—

"(a) The amount of the dividends paid credit provided in section 27(a) \* \* \*."

tial or total, in the year 1939. In fact the petitioners do not contend that it does, but instead freely concede "that the cancellation of a debt which the debtor is able to pay does not entitle the creditor to a deduction for a bad debt." In situations of this sort the question is whether during the year in which the deduction is claimed the debt became worthless irrespective of the composition agreement, and this question the Tax Court in the case at bar has answered in the negative. It said: "In our opinion petitioners were unduly pessimistic. Patents which had been producing gross royalties of $3,436.11 and $4,972.44 in 1937 and 1938, and $5,328.60 during the period January 1 to October 16, 1939, do not ordinarily become worthless merely because a licensee announces that it is making some changes which will result in the avoidance of their use. The licensee never at any time notified Raffold International that it intended to discontinue permanently the use of the patents, and the letter of January 2, 1940, discloses that it had no intention of surrendering its license. Even if it had such an intention, this would not necessarily have been fatal to petitioners' chances of recovering in excess of 10 per cent of their advances. There is no proof that other licensees could not have been obtained, or that Raffold International did not have a net worth in excess of the amount of its indebtedness. * * * Moreover, we think that it was then well within the realm of probability that a paper manufacturer would have made an attractive offer for the patents if Raffold International had indicated in 1939 that they were for sale. In the absence of evidence showing the real value of the patents, we cannot say that the indebtedness of the petitioners became worthless in 1939."

The petitioners say that the foregoing clearly indicates not only that the Tax Court applied an erroneous principle of law in that it required establishment beyond the possibility of a doubt that nothing would ever be realized from International, but also that it drew erroneous inferences from the stipulated facts. We do not see that the Tax Court erred in either respect.

■ "The Taxing Act does not require the taxpayer to be an incorrigible optimist."

United States v. S. S. White Dental Co. of Pennsylvania, 274 U.S. 398, 403, 47 S.Ct. 598, 600, 71 L.Ed. 1120. To warrant a deduction for a bad debt it requires only that the taxpayer establish that during the year for which the deduction is sought a situation developed as a result of which it became evident in the exercise of sound, objective business judgment that there remained no practical, but only a vaguely theoretical prospect that the debt would ever be paid. Deeds v. Commissioner of Internal Revenue, 6 Cir., 47 F.2d 695, 697; Farmer v. Commissioner of Internal Revenue, 10 Cir., 126 F.2d 542, 544.

■■ Obviously this poses a question in the first instance for the Tax Court, the decision of which by that Court we can reverse on petition for review only when "not in accordance with law," (26 U.S.C.A. Int.Rev.Code, § 1141(c) (1) ) that is, when not resting upon an adequate factual foundation. Commissioner of Internal Revenue v. Scottish American Co., 323 U.S. 119, 124, 65 S.Ct. 169, and cases cited. We find such a foundation for the decision of the Tax Court here.

■ To be sure that Court might have inferred from the stipulated facts that International's debt to the petitioners, as a practical matter, became worthless in whole or in part during 1939. It could reasonably have come to the conclusion that in December 1939, there appeared only a vague possibility that International's sole Canadian licensee would resume manufacturing under its license, and that an abandonment by a sole licensee, when over a period of years no other licensees at all had been found, made the debts worthless as a practical matter. But this does not prove the petitioners' case. The fact that inferences pointing one way may be drawn from a given set of facts does not prove that inferences pointing in the opposite direction cannot also be drawn from those facts. And it is the Tax Court's function, not ours, to draw inferences even from stipulated facts. Boehm v. Commissioner, 66 S.Ct. 120. Under principles now familiar [7] our appellate function in questions of this sort is exhausted when we find a substantial basis in the evidence for the conclusions reached by the Tax Court, and it seems to

---

[7] Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248; Commissioner of Internal Revenue v. Scottish American Co., 323 U.S. 119, 65 S.Ct. 169; Bingham Trust v. Commissioner of Internal Revenue, 325 U.S. 365, 65 S.Ct. 1232; Boehm v. Commissioner, 66 S.Ct. 120.

172

us from the facts stipulated that that Court had reasonable grounds for the conclusions which it reached in the instant case. We cannot say that its inference of over-pessimism on the part of those in control of the petitioners' affairs during December 1939 was wholly unwarranted. Nor are we forced to conclude that the Tax Court in drawing this inference applied a standard of "incorrigible optimism."

■ The petitioners' alternative contention that they are entitled to deduct the amounts involved as losses sustained by them in 1939 and not compensated for by insurance or otherwise under § 23(f) of the Internal Revenue Code, is also without merit. Obviously the petitioners cannot deduct the losses sustained by International in that year by reason of the fact that its European patents then became worthless unless the separate corporate identities of the three corporations are disregarded and they are treated as one for tax purposes. This we cannot do. The Tax Court in its opinion said that no exceptional circumstances were present in the case at bar to warrant treatment of the three corporations as a single entity for tax purposes and this determination being with respect to a matter of proper tax accounting, is outside the scope of our review under the doctrine of Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.

■ The only point remaining for consideration is the one made by Process alone to the effect that in cancelling the balance of the debt owed it by International it was in effect paying a dividend and therefore should be allowed a deduction in computing its income subject to the personal holding company surtax under § 504(a) of the Internal Revenue Code, supra. The short answer to this is that International is not a stockholder of Process. Thus the payment, if such it can be called, of Process to International cannot be a payment of a dividend unless the corporate existence of International be disregarded entirely and Rafton personally substituted in its stead. But this, as already appears, we cannot do because the Tax Court has held that for tax accounting purposes the three corporations are to be regarded as each having a corporate entity.

The decisions of the Tax Court are affirmed.

MAGRUDER, Circuit Judge.

I concur in the opinion of the court, with one reservation. I am uncertain whether the rule in the Dobson case requires the reviewing court to accept the Tax Court's determination on such a question as whether, for tax purposes, the separate corporate entities of the three corporations are to be respected or are to be disregarded and the three corporations treated as one. It seems to me that it is unnecessary to put our affirmance on the Dobson case, because in my independent view the Tax Court's determination in this respect was the correct one. Cf. Higgins v. Smith, 1940, 308 U.S. 473, 477–78, 60 S.Ct. 355, 84 L.Ed. 406.