PORTLAND MANUFACTURING COMPANY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3862–68—3868–68.   Filed April 15, 1971.

---

[1] Cases of the following petitioners are consolidated herewith: Annabelle A. Houser, docket No. 3863–68; Duane Autzen, docket No. 3864–68; Thomas E. Autzen, docket No. 3865–68; Thomas Edward Autzen, Duane Autzen, and United States National Bank of Oregon, trustees u/w Thomas John Autzen, decd., docket No. 3866–68; Elizabeth J. Rossman, docket No. 3867–68; The Autzen Foundation, docket No. 3868–68.

*Frederick H. Torp* and *Harry S. Chandler*, for the petitioners.
*Lee A. Kamp* and *Joseph M. Wetzel*, for the respondent.

STERRETT, *Judge:* Respondent has determined deficiencies in the income taxes of Portland Manufacturing Co. of $402,131 for the taxable year ended December 31, 1959, and $569,040.75 for the taxable year ended December 31, 1962. It has also been determined by respondent that the petitioners Annabelle A. Houser; Duane Autzen; Thomas E. Autzen; Thomas Edward Autzen, Duane Autzen and United States National Bank of Oregon, Trustees U/W Thomas John Autzen, Deceased; Elizabeth J. Rossman; and the Autzen Foundation are liable for the above-stated deficiencies as transferees of Portland Manufacturing Co.

We must decide two issues in this case. We are to determine whether Portland Manufacturing Co. sustained a partial business bad debt loss in 1962 deductible under section 166(a)(2).[2] Secondly, we are to decide whether a series of transactions occurring over a 5-day period from December 29, 1961, to January 2, 1962, should be treated as a single transaction wherein Portland Manufacturing Co. is deemed to have traded to Simpson Redwood Co. its interest in a corporation held jointly with Simpson Redwood Co. in exchange for Simpson's one-half interest in a joint venture operated by the two parties. If this second issue is decided against the petitioner, we must go on and decide the value of the interest allegedly received.

FINDINGS OF FACT

Portland Manufacturing Co. (hereinafter referred to as PMC) is a corporation that was organized on May 8, 1901, under the laws of the State of Oregon. PMC at the time of the filing of the petition herein had its principal place of business in Portland, Oreg., and filed its U.S. corporate income tax returns for the taxable years here in issue with

---

[2] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

the district director of internal revenue at Portland, Oreg. PMC was completely liquidated on January 29, 1965.

The individual petitioners herein are:

| Name | Docket No. | Name | Docket No. |
|------|-----------|------|-----------|
| Annabelle A. Houser | 3863-68 | Thomas John Autzen, Trust | 3866-68 |
| Duane Autzen | 3864-68 | Elizabeth J. Rossman | 3867-68 |
| Thomas E. Autzen | 3865-68 | The Autzen Foundation | 3868-68 |

The individual petitioners are transferee-stockholders of PMC and, to the extent of any tax liability of PMC determined in these proceedings, are, pursuant to section 6901 of the Internal Revenue Code of 1954, liable for the amount of PMC's tax liability so determined.

Duane Autzen (hereinafter referred to as Autzen) began his association with PMC in 1946, and became its president in 1955. In addition to operation responsibility for the Portland manufacturing plant of PMC he assumed responsibility for the management of Springfield Lumber Mills, Inc., a sawmill operation in which PMC had a 50-percent interest. From July 12, 1954, until June 27, 1963, he was also a director and a principal operating officer of Silver Tip Logging Co. Autzen was a director of Nicolai Door Manufacturing Co. from August 5, 1953, until September 1, 1961, and of Purdy Brush Co. from November 28, 1950, until the latter part of 1953. From 1963 until 1965 he served on the Advisory Committee to the U.S. Forest Service for the Mt. Hood National Forest.

John B. Taylor (hereinafter referred to as Taylor) has been a certified public accountant since 1942. He became a director and secretary of PMC in 1953. He was president of the Oregon Society of Public Accountants in 1952.

## 1. *Partial Bad Debt Issue*

On September 17, 1959, PMC, together with Henry A. Buehner and A. E. Hurl, organized a corporation under the laws of the State of Montana known as Montana Forest Products, Inc. (hereinafter referred to as MFP), with total authorized capital of $600,000, consisting of 6,000 shares of $100 par value stock. During the year 1962, the shareholders were as follows:

| Name | Number of paid-up shares |
|------|-------------------------|
| PMC | 1, 000 |
| Henry A. Buehner | 1, 000 |
| A. E. Hurl | 130 |
| Total shares | 2, 130 |

The purpose of incorporating MFP was to construct and operate a sawmill in Montana together with the required timber and logging operation incident thereto. Prior to building a sawmill at Philipsburg,

Mont., MFP had preliminary investigations made by consulting foresters as to the availability of timber for the proposed sawmill. The sawmill that was constructed at Philipsburg, Mont., was one of the finest designed mills on the West Coast at that time, incorporating all modern ideas in lumber manufacturing.

During the years 1960 to 1962, inclusive, the stockholders and one William Birkenfeld made the following cash advances to MFP on open account:

| | PMC | Henry A. Buehner | William Birkenfeld |
|---|---|---|---|
| *1960* | | | |
| May | $25,000 | | |
| June | 5,000 | | $100,000 |
| August | 20,000 | | |
| September | 50,000 | | 50,000 |
| October | 150,000 | $2,500 | 50,000 |
| November | | | 30,000 |
| December | 25,000 | | 70,000 |
| *1961* | | | |
| January | 272,976 | 20,000 | 7,000 |
| February | 100,000 | | |
| March | 10,000 | | |
| April | 120,000 | | 43,000 |
| May | 100,000 | 5,000 | |
| June | 125,000 | | |
| July | 250,000 | 10,000 | |
| August | 450,000 | | |
| September | 50,000 | | |
| October | 217,000 | | |
| November | 122,024 | | |
| December | 41,000 | | |
| *1962* | | | |
| January | 65,000 | | |
| February | 105,000 | | |
| March | 160,000 | | |
| May | 75,000 | | |
| June | 15,000 | | |
| July | 62,000 | | |
| August | 97,000 | | |
| September | 200,000 | | |
| November | 75,000 | | |
| Totals | 2,987,000 | 37,500 | 350,000 |

On February 19, 1962, Duane Autzen, William Birkenfeld, Henry A. Buehner, and John B. Taylor, were respectively elected president, vice president, secretary, and treasurer of MFP. These four were also on the board of directors of the company. On the same date the stockholders and directors of MFP authorized execution of both a promissory note to PMC in the amount of $1,800,000 for previous advances made by PMC and a mortgage covering all of the assets of MFP to secure payment of the note. The promissory note and mortgage were duly executed on February 19, 1962. The mortgage was recorded on February 27, 1962, in the mortgage records of Granite County, Mont. The promissory note provided for a maturity date of March 1, 1963, together with interest on the $1,800,000 at the rate of 6 percent per annum. The note did not provide for periodic payments of the $1,800,000 and the amount was not due until the maturity date of the

note. After the execution of the promissory note and mortgage, PMC continued to make open advances to MFP and a portion of these advances was used to pay all taxes and insurance.

The sawmill started operations in October 1961. Personnel problems developed immediately. MFP experienced a labor turnover of approximately 50 percent, and had difficulty attracting key personnel such as a mill superintendent. By November 1962 labor turnover had stabilized at a low level due to the fact that local mines had closed down. The problem of obtaining key personnel continued however.

The anticipated log costs and the projections of operating income and expenses for the MFP operation were based in part upon projections of the Forest Service with respect to the quantity and quality of timber in the Philipsburg area to be purchased from the Forest Service. After operating the mill for a short period, it became apparent that the Forest Service projections were inaccurate as to both quantity and quality, with the result that the actual production levels consistently fell short of those upon which the anticipations and projections were based. Increased road construction became necessary so that the amount of timber required under agreements with the Forest Service could be removed. This caused operating costs to rise and increased the total cost per thousand board feet of lumber produced. Because of defects in the logs, fewer board feet of lumber were produced from the mill than had been projected from scaling the logs prior to working them through the mill. Autzen, as president of MFP, on at least two occasions conferred with representatives of the Forest Service in unsuccessful attempts to renegotiate the method of scaling the timber.

In November 1962, Autzen and Taylor visited MFP twice to evaluate its operation. They reached the tentative conclusion after the first trip that the mill would have to be shut down because it was losing too much money. After the second trip, near the end of November, they decided that there was no possibility of converting MFP to a profitable operation and that PMC could expect only a partial recovery of its investment. During or immediately after the second trip, Autzen instructed the MFP's general manager to cease the logging operations and to reduce the mill work force from two shifts to one shift.

Following the second trip to MFP in November 1962, Taylor directed the preparation of a theoretical statement of income and statement of cost of lumber produced and shipped on a two-shift and a one-shift basis utilizing the actual lumber production data for the month of November 1962. The purpose of this hypothetical projection was to analyze further whether the mill could ever be operated profitably. These projections were based on an assumed cost of logs of

$32.50 per thousand board feet as opposed to the higher actual costs of $47 per thousand board feet then being experienced. With that assumed price and an assumed overrun on scaling of 15 percent, as opposed to the actual zero overrun, it was determined that MFP would realize a loss of $5.06 per thousand board feet produced on a two-shift basis and $16.81 per thousand board feet produced on a one-shift basis. Projected monthly losses were $15,018 on a two-shift basis and $25,061 on a one-shift basis, as opposed to the actual losses of between $60,000 and $80,000 per month. Substantial losses would have been incurred even if expenses for depreciation and taxes were deleted.

After the second trip, Autzen and Taylor determined that the best method of minimizing PMC's loss would be to sell the assets of MFP as a package, including the liabilities arising from the Forest Service contracts. They estimated at that time that all the assets of MFP had a value of between $600,000 and $700,000. The sawmill itself was estimated to have a value of $500,000. The figures were based upon what the officers of PMC, particularly Autzen and Taylor, could expect, according to their experience, the assets of MFP to be sold for.

During the course of his career, Autzen has had occasion to close down and abandon lumber manufacturing operations of substantial size when it became apparent that such operations could no longer be conducted profitably. It was his experience that once such mills were closed down they were disposed of by liquidation and a sale of the assets at substantially less than the original cost.

In December 1962, the directors of PMC determined that no more funds should be advanced to MFP except when necessary to protect PMC's interest in the mortgaged property and that the mortgage should be foreclosed if MFP did not develop a workable means of financing its operations from some other source. On December 17, 1962, PMC sent to MFP by certified mail a letter stating:

Under Paragraph(a), page 11, of the mortgage to us dated February 19, 1962, you have agreed to reimburse us the amounts paid to satisfy taxes, assessments, insurance, liens, encumbrances, or costs of repairs which we have made as mortgagee in order to keep the mortgaged property free and clear from liens or encumbrances.

You are aware that we have from time to time advanced monies for this purpose, the sum total of which now amounts to $185,125.00. We now demand payment of that sum within ten (10) days from this date; and, if payment is not forthcoming within the ten-day period, we will exercise our option to declare the whole sum of both principal and interest which is due and payable to be in default and will proceed at once to foreclose upon the mortgage and take what other steps appear appropriate to protect our interests.

The books and records of MFP were kept in the Portland office of PMC during November and December 1962. Under the corporate

procedures of MFP the general plant manager sent all documents to Portland for payment and he did not have the authority to make the $185,125 payment requested by the demand letter.

On December 29, 1962, by various resolutions of its directors, MFP ceased purchasing logs and commenced the windup of its lumber manufacturing operation, which included the working out of inventories of both logs and lumber. One of the resolutions read in part as follows:

RESOLVED that the officers of the corporation be and they hereby are authorized to take such action as in their judgment might be deemed necessary or desirable to realize for the corporation the highest possible value on the sale of its assets either on a sale on mortgage foreclosure or on a sale arranged by the mortgagee, subject to the concurrence of this corporation; * * *

The sawmill operations were completely shut down in March 1963.

In January 1963, PMC requested a bid for the MFP assets from the Clyde P. Carroll Machinery Co. of Portland, Oreg., a company engaged in the business of selling used sawmill machinery. Carroll inspected the equipment at the mill while it was still operating. On February 18, 1963, as a result of his inspection, the Clyde P. Carroll Machinery Co. offered $221,815 for all of the equipment and buildings of MFP. This offer was not accepted.

Everett L. Miller was employed by MFP on January 18, 1961, and was its plant manager from February 1962 and general manager from July 1962. After the cessation of the sawmill operation in March 1963, Miller continued as an employee of MFP at a salary of $1,200 per month until 1965. While he was an employee of MFP, Miller was in frequent telephonic contact with Autzen, president of MFP, and kept him informed of all progress being made for the possible sale of the plant.

During the first week of December 1962, Miller went to Portland, Oreg., to discuss the closing of the sawmill operation in Montana. At the Portland meeting with Miller, Autzen and Taylor said they would sell the sawmill and related lumbering operation for $1,250,000 to anyone whom their plant manager could interest in the MFP lumbering operation.

As an employee of MFP, Miller approached the principal stockholders of Stebco, Inc., in the latter part of December 1962 in an unsuccessful effort to find a purchaser for the MFP property.

During January 1963 Miller contacted officers of U.S. Plywood Corp. and Hines Lumber Co. Representatives of the two corporations expressed interest but were unable to view the timber during the winter months in Montana. In April 1963, representatives of U.S. Plywood went to Philipsburg, Mont., to view the property. During the

discussion with prospective purchasers of the Montana lumbering operation, Miller advised that the price was $1,250,000. Neither U.S. Plywood nor Hines made an offer to purchase.

In January or early February 1963, Miller advised Autzen that he was attempting to organize a group in the State of Montana to purchase the plant. Miller requested that he be given an option to purchase most of the MFP assets for the price of $1,250,000, approximately 50 percent of the book value of the capital assets. A 30-day option was granted in that amount in July 1963 but was never exercised. At approximately the same time, Autzen suggested to Miller that the price be lowered to a figure of about one-half million dollars. Miller was not an expert in the valuation of sawmill assets.

With knowledge that the lumbering operation was available for a price of $1,250,000, businessmen of Philipsburg, Mont., formed the Granite County Area Redevelopment Committee in February 1963 for the purpose of seeking financing from the Area Redevelopment Administration of the Department of Commerce in an effort to keep the sawmill operation under local ownership. PMC made known the availability of the MFP assets to other potential purchasers, including the Waldorf-Hoerner Co., of Missoula, Mont., Roger Taylor of Missoula, Mont., and the St. Regis Paper Co. of Tacoma, Wash. Roger Taylor did offer about $400,000 for the assets, but the offer was contingent upon his ability to raise the money, which he was not able to do.

At no time during the period from December 1962 until December 1964 were offers to buy received from potential purchasers with the ability to pay.

PMC, on its books and records as of December 31, 1962, wrote down the value of its $2,987,000 of advances to MFP by the amount of $2,-365,950, and claimed a deduction for a partial bad debt on its Federal income tax return for the year ended December 31, 1962, for such amount. The difference between the advances by PMC and the amount claimed as a bad debt, $621,050, was based on the salvage value of the sawmill operation in Montana.

In December 1964, MFP offered all of its assets to Thomas Freeman and Raymond Park for a purchase price of $420,000. The sale at that price was completed in February 1965. After payment of expenses and a commission of $20,000, PMC received $364,895 from the proceeds of the sale. After the purchase, Park and Freeman liquidated the mill piecemeal through an auction sale of the machinery and equipment.

On its books and records and on its Federal income tax return for the calendar year ended December 31, 1964, PMC wrote off the difference between $620,000, the value then shown on the books of PMC

for the debt of MFP after taking into account the proceeds of the sale of an automobile, and $364,895, the amount ultimately received by PMC with respect to MFP assets. PMC claimed a bad debt deduction of $255,105 on its Federal income tax return for the year ended December 31, 1964.

The parties have stipulated that to the extent the debt of MFP to PMC was partially worthless on December 31, 1962, PMC is entitled to a deduction under section 166(a)(2) of the Internal Revenue Code of 1954, as amended.

In a statutory notice dated June 17, 1968, respondent disallowed a portion of the bad debt loss deduction stating:

It has been determined that the loss was overstated by $1,021,397.92 on the grounds that the estimated realizable value of the assets of Montana Forest Products, Inc., has been understated.

The allowable loss from advances to Montana Forest Products, Inc., is computed as follows:

VALUE OF ASSETS OF MONTANA FOREST PRODUCTS, INC.

| | |
|---|---|
| Mill site, buildings, equipment | $1,250,000.00 |
| Forest Service contracts | No value |
| Hoben & Pauly timber tracts | 176,173.44 |
| Logging roads, unamortized costs | 166,824.02 |
| House, office building, mobile equipment, balance on mortgage and purchase contracts | 8,442.42 |
| Log and timber inventory | 41,008.04 |
| Total estimated realizable value | 1,642,447.92 |
| Advances to Montana Forest Products, Inc. | 2,987,000.00 |
| Less estimated realizable value of assets | 1,642,447.92 |
| Allowable loss | 1,344,552.08 |

## 2. *Springfield-Plylock Separation Issue*

Beginning in 1931, PMC acquired various coownerships with M & M Woodworking Co. (hereinafter referred to as M & M) and with its successor, Simpson Redwood Co. (hereinafter referred to as Simpson), a Washington corporation. Since that date PMC has been engaged primarily in the manufacture of dimension lumber and boards, and box covers and bottoms, although PMC has also engaged in the plywood business through operating arrangements with M & M and Simpson.

In 1940, PMC and M & M each purchased an undivided one-half interest in certain real and personal property which constituted a plant for the manufacture of plywood known as Albany-Plylock (hereinafter referred to as Plylock). From December 1940 to August 1956,

M & M operated this plant under a lease agreement with PMC which provided for equal sharing of profits and losses. On August 17, 1956, Simpson purchased the interest of M & M in Plylock. From the date of the purchase the Plylock plant was operated by Simpson pursuant to a lease agreement with PMC which also provided for equal sharing of profits and losses.

On April 16, 1945, Springfield Lumber Mills, Inc. (hereinafter referred to as Springfield), was incorporated under the laws of the State of Oregon. At incorporation PMC and M & M each held a 50-percent stock interest in Springfield, constituting, respectively, 15,000 shares of common stock. PMC's basis in said stock for Federal income tax purposes was $150,000. In 1949, the authorized capitalization of Springfield was increased from 30,000 to 50,000 shares of $10 par value stock. Subsequently, 5,000 shares of additional stock were issued to each shareholder. PMC paid $50,000 for its additional shares resulting in a total basis of $200,000 for its stock in Springfield. On August 17, 1956, Simpson purchased the 20,000 shares of Springfield then held by M & M. Springfield owned and operated a mill for the manufacture of dimension lumber and boards at Springfield, Oreg. The principal activity of Simpson in the State of Oregon was the manufacture and sale of veneer and plywood products.

At all times from December 9, 1958, until January 2, 1962, the directors of Springfield were William G. Reed, C. H. Bacon, Jr., and H. W. McClary representing Simpson, and Duane Autzen, Thomas E. Autzen, and John B. Taylor representing PMC. During all such times the officers of Springfield were as follows:

| | |
|---|---|
| President | Duane Autzen |
| Vice president | C. H. Bacon. Jr. |
| Vice president and general manager | D. O. Hendricks |
| Treasurer | H. W. McClary |
| Secretary | J. B. Taylor |
| Assistant secretary | E. E. Swanson |

Thus, as of December 29, 1961, PMC and Simpson each owned 50 percent of the stock of Springfield and each had a 50-percent interest in the assets of Plylock.

Shortly after acquiring M & M's interests in Plylock and Springfield, Simpson expressed an interest in having it and PMC separate their interests. By 1961 differences of opinion had accumulated between PMC and Simpson regarding the operations and conduct of the businesses of Plylock and Springfield. These differences of opinion arose because of PMC's primary interest in the manufacture of lumber and Simpson's conflicting primary interest in the

manufacture of plywood and veneer products. PMC provided the day-to-day management supervision of Springfield without additional compensation and found it difficult to obtain the interest or participation of the Simpson representatives in management problems.

As a consequence of their differences, Simpson and PMC agreed in principle to a program with the objective of a complete separation of their interests in Springfield and Plylock. It was the intention and contemplation of the parties that a division would be effected whereby the 50-percent interest in Plylock owned by PMC would rest finally with Simpson, and the 50-percent interest in Springfield owned by Simpson would rest finally with PMC.

Simpson, on December 18, 1961, organized an Oregon corporation known as Albany-Plylock Corp. (hereinafter referred to as APC). Articles of incorporation were filed with the corporation commissioner of the State of Oregon on December 20, 1961. The directors of APC, W. G. Reed, Thomas F. Gleed, and C. E. Runacres, Jr., were all representatives of Simpson.

On December 29, 1961, Simpson transferred its one-half interest in the real and personal property used in the Plylock operation to Springfield. On January 2, 1962, PMC also transferred its one-half interest in the Plylock property to Springfield. PMC's basis, for Federal income tax purposes, in the Plylock assets prior to January 2, 1962, was $100,387.89.

The directors of Springfield, on January 2, 1962, adopted a resolution containing a "Plan of Reorganization." Under the plan all the assets of the Plylock joint venture which had been transferred to Springfield were to be transferred to APC in exchange for 322 shares of APC no-par stock, which was apparently all the outstanding stock in APC. The plan also called for distribution of all the APC stock to Simpson in exchange for Simpson's Springfield stock. Following adoption of the resolution and on the same day, a deed and bill of sale were prepared which conveyed and transferred to APC all of the assets utilized in operation of the Plylock plant. The deed was thereafter duly recorded. Also on January 2, 1962, the stockholders and directors of APC adopted a resolution approving issuance to Springfield of 322 shares of the capital stock of APC in exchange for the real and personal property of the Plylock plant. Certificate No. 1, representing the 322 shares of outstanding stock of APC, was issued and delivered to Springfield on January 2, 1962.

After receiving the certificate representing all of the outstanding shares of APC, Springfield, on January 2, 1962, redeemed all of its 20,000 shares held by Simpson by endorsing and delivering to Simpson

the certificate representing all of the outstanding stock of APC and by accepting surrender of the certificate representing the 20,000 shares of Springfield stock held by Simpson.

On January 3, 1962, Simpson caused to be filed with the corporation commissioner of the State of Oregon a Statement of Intent to Dissolve APC pursuant to its consent as sole shareholder executed on January 2, 1962. APC was liquidated and Simpson received all of the assets of the old Plylock joint venture into its own corporate structure. APC had a corporate existence of less than 1 month, was in the process of dissolution 14 days after its creation, and never had journals, posting ledgers, asset ledgers, or books of account of any kind.

As of January 5, 1962, Simpson was the sole owner of the Plylock operation assets, and PMC was the sole owner of the stock in Springfield. At all times material hereto, the manufacturing and business operations of the Springfield lumber mill and the Plylock plant continued without interruption.

Accounting entries appropriate to reflect the various transfers leading to PMC's 100-percent ownership of Springfield and Simpson's 100-percent ownership of the Plylock assets were made on the books of Springfield and Simpson. On its books Simpson recorded the Plylock assets as being received in exchange for its stock interest in Springfield.

W. G. Reed, C. Henry Bacon, Jr., and H. W. McClary, who had previously served as directors of Springfield representing Simpson, submitted their resignations as officers and directors of Springfield on January 2, 1962. Springfield, on January 8, 1962, amended its by-laws to provide for a board of four directors and Autzen, Taylor, Thomas E. Autzen, and D. O. Hendricks, all representatives of PMC, were elected directors of Springfield. On the same date, the following individuals were appointed officers of Springfield:

President _____ Duane Autzen
Vice president _____ D. O. Hendricks
Treasurer _____ Thomas E. Autzen
Secretary _____ John B. Taylor

On March 27, 1962, pursuant to a resolution by its directors, Springfield executed a Statement of Cancellation of Reacquired Shares and amended its articles of incorporation to reduce its authorized capitalization to 20,000 shares of $10 par value stock. The Statement of Cancellation of Reacquired Shares and articles of amendment reflecting the reduction of stock were filed with the corporation commissioner of the State of Oregon on May 2, 1962.

### 3. *Valuation of Springfield stock*

As of January 1, 1962, the balance sheet of Springfield Lumber Co. indicated the book value of its assets was as follows:

*Assets*

Current assets:

| | |
|---|---|
| Cash | $34, 105. 62 |
| Time deposits | 305, 525. 00 |
| Accounts receivable (none past due) | 62, 546. 88 |

Inventory:

| | |
|---|---|
| Logs | 99, 705. 00 |
| Lumber | 106, 725. 00 |

Deferred charges:

| | |
|---|---|
| Stumpage | 18, 576. 65 |
| Insurance | 10, 603. 82 |
| Supplies | 9, 691. 70 |
| Land and timber | 641, 427. 19 |
| Plant, property, and equipment (net of depreciation) | 363, 755. 93 |
| One-half interest in Albany-Plylock joint venture | 322, 000. 00 |
| **Total assets** | **1, 974, 662. 79** |

*Liabilities*

Current liabilities:

| | |
|---|---|
| Accounts payable | $12, 613. 56 |
| Accrued payroll and payroll taxes | 25, 260. 24 |
| Accrued Lane County taxes | 5, 966. 07 |
| Taxes on income—current year | 28, 500. 00 |
| **Total current liabilities** | **72, 339. 87** |

The land and timber which was carried on the books and records of Springfield Lumber Co. at a book value of $641,427.19 consisted of three tracts of timber, known as St. Paul, McFadden, and Bohemia mining claim. The three tracts of timber were not in the operating area for the Springfield sawmill. The operating area is considered to be an area from which all logs in that area are delivered to one common market.

The volume and fair market value (FMV) on January 2, 1962, of Springfield's various timber holdings was as follows:

| Tract | Timber (thousand board feet) | Land (acres) | FMV timber | FMV land | Total FMV |
|---|---|---|---|---|---|
| St. Paul | 30, 000 | 640 | $960, 000 | $12, 800 | $972, 800 |
| McFadden | 5, 000 | 300 | 150, 000 | 6, 000 | 156, 000 |
| Bohemia | 14, 441 | | 361, 025 | | 361, 025 |
| Total FMV timber and land | | | | | 1, 489, 825 |

In accordance with a resolution by its board of directors dated February 20, 1964, Springfield distributed to PMC as a dividend cash in the amount of $574,101; property consisting of time deposits with the United States National Bank of Oregon in the amount of $200,000 plus accrued interest of $1,827 and a note of Top Line Equipment Co. with a balance as of February 20, 1964, of $61,000, and all of this corporation's timber and timberlands carried on its books at $637,686. During 1964, and following the adoption of a plan of complete liquidation, PMC sold the timber acquired from Springfield to Portland Lumber Mills, Inc., an unrelated company, for $1,325,000, and sold the capital stock of Springfield to Autzen for $300,000. PMC subsequently distributed all of its assets to its stockholders pursuant to a plan of complete liquidation and dissolution.

Springfield's average net income for the 10 years preceding the transactions resulting in PMC's full ownership was approximately $63,000 per year. During the most recent 5 years of the 10-year period, Springfield experienced a loss year and a year of extraordinarily strong profit.

The Medford Corp. of Pacific Lumber Co. and the Edward Hines Lumber Co. operate businesses similar to Springfield. These companies, however, were more broadly diversified than Springfield. Their timber holdings were in better proportion to their needs. They were stronger financially, more broadly diversified in their credit lines, and in a stronger position to maintain their competitive position in the industry. The stock of these two companies was widely held and actively traded. During the period in controversy the stock of the Medford Corp. and the Edward Hines Lumber Co. sold at a price earnings ratio of 15:1.

As of January 2, 1962, the fair market value of one-half the outstanding stock of Springfield was $1,027,000.

In the statutory notice dated June 17, 1968, respondent briefly analyzed the transactions here in question and stated:

It has been determined that the foregoing series of related transactions do not qualify for nonrecognition of gain under section 355 of the Internal Revenue Code of 1954.

It further has been determined that the foregoing transactions were in substance merely an exchange of the proprietary interest in Albany Plylock Co. held by Portland Manufacturing Company for all of the stock of Springfield Lumber Mills, Inc., held by Simpson Redwood Company, and that such exchange was a taxable transaction resulting in capital gain of $1,137,182.01 computed as follows:

STOCKHOLDER'S EQUITY (SPRINGFIELD LUMBER MILLS, INC.)

| | | |
|---|---:|---:|
| Assets | $2, 869, 479. 67 | |
| Liabilities | 72, 339. 87 | |
| | | $2, 797, 139. 80 |
| Less assets of Albany Plylock plant removed by Simpson Redwood Co | | —322, 000. 00 |
| Balance | | 2, 475, 139. 80 |
| Reduce by 50% for equity previously owned by you | | —1, 237, 569. 90 |
| Value received | | 1, 237, 569. 90 |
| Adjusted basis, Albany Plylock assets | | —100, 387. 89 |
| Capital gains realized (long term) | | 1, 137, 182. 01 |

At trial the parties filed with the Court a stipulation as to pleadings whereby the petitions were amended to include an allegation that the value of a 50-percent interest in the stock of Springfield as of January 2, 1962, was not in excess of $562,500, and the answers were amended to request the Court to find such increased deficiency as may result if the stock of Springfield is determined to have a greater value than that determined in the statutory notice. As the case was finally submitted, respondent asserted that a 50-percent interest in the stock of Springfield as of January 2, 1962, had a value of $1,491,570.

OPINION

The first question we are to decide is whether the petitioner Portland Manufacturing Co. is entitled to a deduction in 1962 in the amount of $2,365,950 on account of the partial worthlessness of debts owed to PMC by Montana Forest Products, Inc. The parties are agreed that some portion of the $2,987,000 owed to PMC by MFP became worthless in 1962. Respondent contends that the amount of partial worthlessness is only $1,344,552.08. Thus it is only the amount, and not the legal availability, which is in issue.

With respect to partially worthless debts section 166(a)(2) provides:

SEC. 166. BAD DEBTS.
  (a) GENERAL RULE.—
      *       *       *       *       *       *       *
      (2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

This statute and its progenitors have consistently been construed to give the Commissioner "some measure" of discretion in determining the availability of a deduction for the partial worthlessness of a debt. *Mayer Tank Mfg. Co.* v. *Commissioner*, 126 F. 2d 588 (C.A. 2, 1942),

affirming a Memorandum Opinion of the Board of Tax Appeals; *H. W. Findley*, 25 T.C. 311, 318 (1955), affirmed per curiam 236 F. 2d 959 (C.A. 3, 1956). A taxpayer must be able to demonstrate to the satisfaction of the Commissioner that upon consideration of all the surrounding circumstances a part of a debt owed the taxpayer is not recoverable. *Giles E. Bullock*, 26 T.C. 276, 299 (1956), affirmed per curiam 253 F. 2d 715 (C.A. 2, 1958). Courts have held that the Commissioner's exercise of discretion cannot be reversed unless it is arbitrary and unreasonable and the Commissioner has thus abused his discretion. *Wilson Bros. & Co.* v. *Commissioner*, 124 F. 2d 606, 609 (C.A. 9, 1941), affirming on this issue a Memorandum Opinion of the Board of Tax Appeals, *Olympia Harbor Lumber Co.* v. *Commissioner*, 79 F. 2d 394, 396 (C.A. 9, 1935), affirming 30 B.T.A. 114 (1934); *H. W. Findley, supra* at 318.

However, the Commissioner's discretion over the question of partial worthlessness is not absolute and must be based upon reason. *Estate of Harris Fahnestock*, 2 T.C. 756, 759 (1943). Accordingly, we do not think that respondent can ignore the soundly exercised business judgment of PMC's officers. The courts have long given weight to such judgment in cases involving the determination of total worthlessness under section 166(a)(1) or its predecessor. *Minneapolis, St. Paul Railroad Co., et al.*, 164 Ct. Cl. 226, 241 (1964); *Raffold Process Corp.* v. *Commissioner*, 153 F. 2d 168, 171 (C.A. 1, 1946). We see no reason why such judgment should not also be relevant in evaluating the reasonableness of the respondent's exercise of the discretion accorded him under section 166(a)(2). Thus, even though the taxpayer has a heavier burden under section 166(a)(2) than under section 166(a)(1), if the business judgment is coupled with facts which clearly establish the sagacity of such judgment, then it must be held that respondent did not reasonably exercise his discretion. *Clark* v. *Commissioner*, 85 F. 2d 622 (C.A. 3, 1936).

The decision to write off $2,365,950 of MFP's indebtedness to PMC was essentially made by Autzen who was a director and president of PMC and by Taylor who was a director and secretary of PMC. Autzen and Taylor came before this Court as witnesses in the petitioner's behalf and testified as to the facts and circumstances of their decision. Both men have extensive backgrounds in the lumber industry on a managerial level. They appeared to be credible and we find no reason to doubt their testimony.

The indebtedness of MFP was written down to what Autzen and Taylor felt was the salvage value of MFP's assets which PMC as mortgagee would recover. The estimate was based on a determination that MFP had no going-concern value. MFP had suffered continuing losses for 14 months. Estimates as to quantity and quality of timber

covered by contracts between the Forest Service and MFP were woe-fully inaccurate, and the Forest Service was disinclined to renegotiate the contracts on a basis more favorable to MFP. During November 1962, Autzen and Taylor made two visits to MFP to evaluate its operation. Even after the first trip they were of the opinion that MFP would have to be shut down because it was losing too much money. After the second trip there was prepared under Taylor's direction a hypothetical projection of income for MFP based on actual production data for the month of November. Even using more favorable cost data, the projection produced monthly losses of between $15,018 and $25,061. With the actual cost data, projected losses were between $60,000 and $80,000. Thus it appears that PMC's officers were correct in their estimate that MFP had no going-concern value. The soundness of this determination is illustrated by the fact that the MFP assets, despite some effort on the part of PMC, were not sold until 1964, and then for only $420,000 to two individuals who liquidated the mill in an auction sale of the machinery and equipment. See *Minneapolis, St. Paul Railroad Co., et al., supra* at 241.

After determining that MFP had no going-concern value, it was estimated by PMC that the MFP assets available to satisfy PMC's mortgage had a salvage value of $621,050. The estimate was essentially formulated by Autzen who during his nearly 20 years in the lumber industry had experience in closing down and liquidating sawmills and also had experience in purchasing the assets of mills which had closed down. Again the soundness of this determination is illustrated by subsequent events. *Minneapolis, St. Paul Railroad Co., et al., supra.* In February 1963, less than 2 months after PMC wrote the MFP debt down, PMC received a bid from the Clyde P. Carroll Machinery Co. offering $221,815 for all the buildings and equipment of MFP. The Carroll Machinery Co. was engaged in the business of selling used sawmill machinery.

A large part of the total estimated realizable value of $1,642,447.92 placed on the MFP assets by the Commissioner derives from a value of $1,250,000 placed on the millsite, buildings, and equipment. The value placed on the mill by respondent is apparently derived from the fact that Everett L. Miller (hereinafter sometimes referred to as Miller), the plant manager for MFP, was given a 30-day option on MFP's mill and certain other related assets in July of 1963. The option was given to Miller not for his own use but as part of Miller's effort to find a purchaser for the MFP operation. The price arose out of a conversation between Miller and PMC's officers in December of 1962. Miller, who testified for the respondent, was by his own admission no expert in the valuation of sawmill assets. Clearly the price of $1,250,000 was a top asking price which would have been negotiated

down by a reasonably perceptive forest products entrepreneur. Indeed it appears from the record that the only offer other than the bid by the Carroll Machinery Co. between December of 1962 and December 1964 was one for $400,000 by an individual who could not raise the money. PMC was in the position of trying to salvage what it could from a bad debt, and, understandably, would not discourage any positive activity which might improve the situation however improbable the success of the activity might be. That PMC did not give a great deal of credence to the $1,250,000 figure is illustrated by the fact that, at about the same time Miller was given the option, Autzen suggested to him that the price be lowered to $500,000.

In his brief respondent asserts that no evidence was introduced as to the value of MFP assets other than the mill. The record is clear that the valuation of MFP assets made by petitioner's officers in December 1962 included all the assets of MFP.

To be sure a taxpayer cannot merely assert an entitlement to a large deduction for the partial worthlessness of a debt and thereby place upon the Commissioner the burden of showing that only a smaller deduction is justified. *Lehman* v. *Commissioner*, 129 F. 2d 288, 290 (C.A. 2, 1942), affirming a Memorandum Opinion of the Board of Tax Appeals. Here, however, petitioner has demonstrated that the hopeless condition of its debtor justifies a deduction for the partial worthlessness of the debt in the amount taken. *American Processing and Sales Co.* v. *United States*, 371 F. 2d 842 (Ct. Cl. 1967); *George E. Warren Corporation* v. *United States*, 135 Ct. Cl. 305, 312, 141 F. Supp. 935, 940 (1956); *Allie M. Turbeville*, 31 B.T.A. 283, 294 (1934), affirmed without discussion of this point 84 F. 2d 307 (C.A. 5, 1936). Accordingly we decide that respondent has exceeded his discretion and that PMC is entitled to a deduction of $2,365,950 in the taxable year 1962 on account of the partial worthlessness of debts owed to PMC by MFP.

Now we turn to the second question of whether PMC exchanged its half interest in the Albany-Plylock joint venture for the one-half interest of Simpson Redwood Co. in Springfield Lumber Mills, Inc. As of December 1961 PMC and Simpson each owned a 50-percent interest in Plylock and in Springfield. PMC was engaged primarily in the manufacture of dimension lumber and boards, and box covers and bottoms, whereas Simpson was principally engaged in the manufacture and sale of veneer and plywood products. The Plylock joint venture was a plant manufacturing plywood. Springfield owned and operated a mill manufacturing dimension lumber and boards.

Differences of opinion between PMC and Simpson concerning the operation of Plylock and Springfield had arisen and persisted during the 5 years immediately preceding December 1961. These differences

had their source in the fact that PMC was primarily interested in the manufacture of lumber whereas Simpson was primarily interested in the manufacture of plywood and veneer products. Simpson had for some time expressed a desire to have a separation of interests. By December 1961 PMC and Springfield had agreed to undertake a complete separation of their interests in Plylock and Springfield, and that a division would be effected whereby PMC would become the sole owner of Springfield and Simpson would become the sole owner of Plylock.

PMC and Simpson proceeded to accomplish their agreement in the following manner. Simpson, on December 18, 1961, organized the Albany-Plylock Corp. On December 29, 1961, Simpson transferred all of its interest in the Plylock joint venture to Springfield. PMC transferred its half interest in Plylock to Springfield on January 2, 1962. On that same day Springfield transferred all the Plylock assets to APC in exchange for all the stock of APC, and then transferred all the stock of APC to Simpson in redemption of all the Springfield stock held by Simpson. Simpson, on January 3, 1962, filed with the State corporation commissioner a statement of intent to dissolve APC, and on January 18, 1962, filed articles of dissolution by consent of the shareholders. APC was liquidated and Simpson received all the assets of the Plylock joint venture into its own corporate structure. At the culmination of these transactions, Simpson was the sole owner of the Plylock assets and PMC was the sole owner of the Springfield stock.

Petitioner asserts that the series of transactions here outlined constitutes a split-off reorganization under section 355,[3] and in any event the only activity PMC undertook in the whole process was a capital contribution which is not an occasion for the imposition of income taxes. Respondent says the transactions, when looked at as a whole, simply constitute an exchange by PMC of its 50-percent interest in Plylock for Simpson's 50-percent interest in Springfield, which exchange is taxable at capital gains rates in the year completed, 1962,

[3] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.
 (a) EFFECT ON DISTRIBUTEES.—
  (1) GENERAL RULE.—If—
   (A) a corporation (referred to in this section as the "distributing corporation")—
    (i) distributes to a shareholder, with respect to its stock, * * *
   (C) the requirements of subsection (b) (relating to active businesses) are satisfied, and
   (D) as part of the distribution, the distributing corporation distributes—
    (i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, * * *
  then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

under sections 61(a) and 1002.[4] We are compelled to agree with respondent.

PMC and Simpson each owned a one-half interest in two distinct and separate business organizations. It is clear that because of disagreements, petitioner and Simpson wanted to separate their interests so that PMC, which was in the dimension lumber business, would end up with all the stock of Springfield which was in the same business as PMC, and Simpson would have Plylock which, like Simpson, manufactured plywood. Simply put, there was an exchange of interests, and the various steps taken to arrive at the final settlement were but component parts of a single transaction. *Redwing Carriers, Inc.* v. *Tomlinson*, 399 F. 2d 652, 654 (C.A. 5, 1968), affirming an unreported decision of the District Court (M.D. Fla. 19 A.F.T.R. 2d 1253, 67–1 U.S.T.C. par. 9392) ; *S. Nicholas Jacobs*, 21 T.C. 165, 169 (1953), affd. 224 F. 2d 412 (C.A. 9, 1955) ; *Kimbell-Diamond Milling Co.*, 14 T.C. 74, 80 (1950), affirmed per curiam 187 F. 2d 718 (C.A. 5, 1951) ; *John Simmons Co.*, 14 T.C. 29, 32 (1950). The series of capital contribution, split-off, and liquidation was merely a circuitous route to that end taken in the hope of transmuting the fundamental nature of the transaction along the way. *Griffiths* v. *Commissioner*, 308 U.S. 355, 358 (1939) ; *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613 (1938).

To be sure, a taxpayer has the right to arrange his affairs so as to reduce the amount of tax incident to a transaction. *Gregory* v. *Helvering*, 293 U.S. 465, 469 (1935). However, this means a taxpayer may resort to tax planning, and not alchemy whereby mixing a brew of incorporation, conveyance, and liquidation, and incanting the language of deeds, bills of sale, and corporate minutes, a taxable exchange is changed into a tax-free reorganization.

The artificiality of the transaction is apparent when it is realized that the Plylock assets moved through the corporate hands of Springfield and APC in a matter of days, never pausing long enough to serve any business purpose, until they reached their ultimate destination, Simpson, where, for all we know, they have remained ever since. We fail to see how any legal significance can be attached to the two momentary stopovers. Cf. *Ragland Investment Co.*, 52 T.C. 867 (1969), affd. 435 F. 2d 118 (C.A. 6, 1970).

---

[4] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items :

*     *     *     *     *     *     *

(3) Gains derived from dealings in property ;

SEC. 1002. RECOGNITION OF GAIN OR LOSS.

Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.

Petitioner in support of its contention that the transactions leading to the division of interest held in common with Simpson was a section 355 split-off, cites and principally relies on the cases of *W. E. Gabriel Fabrication Co.*, 42 T.C. 545 (1964), and *Albert W. Badanes*, 39 T.C. 410 (1962). For reasons in addition to those implicit in the preceding discussion these cases are inapposite.

In *Badanes* the taxpayer and another were equal stockholders in two corporations. One, Braq-Cincinnati, was engaged in the bottling business through two plants located in Cincinnati and Portsmouth, Ohio, and the other, Realty Co., leased real estate to Braq-Cincinnati. The two shareholders could no longer agree on how to conduct the business and decided to divide their interests. Accordingly the taxpayer and the other shareholder contributed their interests in Realty Co. to Braq-Cincinnati. Braq-Cincinnati then transferred to Braq-Portsmouth, a new corporation, all the shares of Realty Co., $79,000 in cash, and all the operating assets of the Portsmouth bottling unit, and received in exchange all the shares of Braq-Portsmouth. Then Braq-Cincinnati distributed to the taxpayer all the shares of Braq-Portsmouth in exchange for all his stock in Braq-Cincinnati. The Court found that the desire of two businessmen to separate their interests because of disagreements as to the manner of conducting a business provided a sufficient business purpose for the transaction and, thus the transaction qualified for tax-deferred treatment under section 355.

Here also the parties were in disagreement on how to proceed in businesses jointly held. However there is an important contrast with *Badanes*. *Badanes* involved most importantly the separation of two bottling businesses being conducted by one corporation, where the situation arising from the conduct of corporate affairs dictated the necessity of separating the two businesses. The transfer of the shares in Realty Co. was merely incidental to this main transaction. In the present case, the business purpose preceded and, indeed, prompted the creation of the corporate situation seemingly requiring the separation of the two businesses by means of a corporate division. Accord, *Jackson v. Commissioner*, 233 F. 2d. 289, 290 (C.A. 2, 1956), affirming 24 T.C. 1 (1955); *Virginia W. Stettinius Dudley*, 32 T.C. 564, 585 (1959), affirmed per curiam 279 F. 2d 219 (C.A. 2, 1960).

*W. E. Gabriel Fabrication Co., supra*, also involved the separation of business being run by one corporation due to disagreements between the owners. Immediately after agreeing in principal to the separation but 14 months before the formal consummation of the corporate division, all the assets utilized in one of the businesses were transferred to the taxpayer who operated that business as a sole proprietorship. The case concerned whether the active-business requirements of section 355(b) had been satisfied. The Commissioner asserted that the active-

business requirements were not complied with because 14 months before the formal corporate division the distributing corporation had ceased to conduct the business taken over by the taxpayer. This Court determined the issue against the Commissioner.

Whether the putative corporate division in the present case fails solely because the active-business requirements of section 355 are not met is of no moment, and *W. E. Gabriel Fabrication Co., supra,* has no application to this case. Strictly speaking section 355 concerns only the distributee who receives stock in the controlled corporation. The role PMC played in the scheme was that of the party who, after making a capital contribution, simply retained its stock in the distributing corporation and in the course of things became owner of all the outstanding stock in the distributing corporation.

This brings us to petitioner's other major contention. It is asserted that, since PMC made a capital contribution and then became owner of 100 percent of the Springfield stock only because all of Simpson's stock in Springfield was redeemed, no exchange took place on which gain should be realized. The clear answer to this contention is that it concentrates on some formal aspects of the larger transaction to the exclusion of the whole picture. What took place was an exchange of interests and not simply a capital contribution followed by a redemption or a split-off.

Petitioner may be right in its contention that the documentation at each stage of the transaction was in full order and that all recordation requirements were met. However it is not our duty to decide whether the technicalities of Oregon property and corporate law have been complied with, rather it is our task to judge the nature of the transaction from the point of view of Federal tax law. A court in making such a determination is not bound by the formalities of title, but rather will look to the substance of the transaction. *Commissioner* v. *Court Holding Co.,* 324 U.S. 331, 334 (1945). Here the substance of the transaction was an exchange of interests.

Since we have held that PMC exchanged its one-half interest in Plylock for Simpson's stock in Springfield, we must now decide the third and final question relating to the amount of gain realized in the exchange by PMC. This requires that we determine the fair market value of the stock received by PMC.[5] Fair market value is said to be the price at which property would change hands, after negotiation, between a willing buyer and a willing seller, both being informed and

---

[5] SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, * * *

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

neither being under compulsion to buy or sell. *In Re Williams' Estate*, 256 F. 2d 217, 218 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court. In the present case all the stock of Springfield was closely held and no contemporaneous sale transactions in the market place are available to gauge the fair market value of the stock. Lacking evidence of an open market, there is no generally applicable formula by which fair market value is to be determined, and all circumstances connected with the corporation can be considered. *O'Malley* v. *Ames*, 197 F. 2d 256, 258 (C.A. 8, 1952), affirming 91 F. Supp. 463 (D. Neb. 1950).

Petitioner contends that the Springfield stock it received had a total value of $562,500. Dale Belford, an investment broker, was qualified as an expert witness and testified as the only witness in support of petitioner's contention. Belford arrived at a fair market value of $562,500 by first determining that the average net income of Springfield for the 10 years prior to the exchange was $63,000. Then allowing for the fact that in the 5 most previous years there was a loss year and an exceptionally profitable year, Belford made an analysis and applied his best professional judgment, and determined that a fair and representative projected net profit from Springfield as of January 1962 would be $100,000 per year. To the projected annual earnings there was applied a multiplier of 15, producing $1,500,000. This multiplier was utilized because the stock of two similar companies, whose shares were actively traded in the open market, was being sold at a price equal to 15 times earnings. Since these two companies were stronger financially and more diversified than Springfield, Belford applied a discount of 25 percent to the figure of $1,500,000 producing a fair market value of $1,125,000 for all the stock of Springfield. Divided in half this yields a fair market value of $562,500 for the one-half interest acquired by PMC.

Belford made it very clear that he was valuing the Springfield stock principally from the point of view of capitalization of earnings. He considered the assets of Springfield incidently and solely from the point of view of how they could be employed in the corporate mix to produce income. However, when dealing with a closely held corporation whose stock has not experienced sales to establish its market value, the value of the net assets of the corporation are also of importance. *Trianon Hotel Co.*, 30 T.C. 156, 181 (1958).

Respondent asserts that the fair market value of the Springfield stock received by PMC was $1,491,570 based upon a valuation of the underlying assets. The value originally placed upon the stock received from Simpson by respondent in the statutory notice was $1,237,569.90. The increased value is being asserted by way of amendment to answer. Accordingly, as to the difference between the amount asserted in the

statutory notice and the amount presently contended for, respondent has the burden of proof. Rule 32, Tax Court Rules of Practice; *Beck Chemical Equipment Corporation*, 27 T.C. 840, 856 (1957).

Respondent in making his determination placed a higher value on Springfield's timber holdings and its mill including equipment and site than was shown in Springfield's balance sheet as of January 1, 1962. Although Springfield's balance sheet showed the timber at a value of $641,427.19, respondent valued the holdings at $1,489,825. Respondent to support this figure presented the testimony of Frank E. Schrom who is an experienced valuation forester. The valuation was based upon sales in the area of the tracts taking into account the high demand for timber in the area at the time in issue. With respect to the Bohemia tract allowance was made for the fact that due to the shape of the property access was not readily available and that logging costs would be higher than normal. Estimates of the board feet of timber in the various tracts were obtained from Schrom from Schedule T of Springfield's Federal income tax return for the year ending July 31, 1962. The tracts were not in the operating area of Springfield's mill. Petitioner presented no evidence and no witnesses to challenge respondent's estimates with respect to the timber tracts. Generally the valuation made appears to be credible. We feel that these sizable and valuable timber holdings would be taken into account by a willing buyer and willing seller in addition to the earning capacity of Springfield as a going concern.

Respondent placed a value of $908,000 on Springfield's mill, including site and equipment, whereas Springfield's balance sheet carried the asset at $363,755.93. The considerably higher valuation was arrived at by respondent by the process of ascertaining the asset value of the plant, site and equipment, ostensibly $508,000, and then assigning an "intangible value" of $400,000 to the same group of assets because of their capacity to produce income. This method in our opinion has the effect, in the present situation, of considering the same item twice and as a result producing a value which is excessive as to the item.

Upon an examination of the evidence, and taking into consideration how the burden of proof was distributed, it is our opinion that the block of Springfield stock received by PMC in exchange for its one-half interest in Plylock had a fair market value of $1,027,000 on the date of the exchange, and we so hold. It was stipulated that PMC had a basis of $100,387.89 in its share of Plylock's assets. Consequently PMC realized a gain of $926,612.11 on the exchange which amount is taxable as capital gain.

In accordance with the foregoing,

*Decisions will be entered under Rule 50.*