Kenneth P. Harrington and Arola Harrington v. Commissioner.
Harrington v. Commissioner
Docket No. 6107-69.
United States Tax Court
T.C. Memo 1972-181; 1972 Tax Ct. Memo LEXIS 77; 31 T.C.M. (CCH) 888; T.C.M. (RIA) 72181; August 21, 1972
*77 P is the sole shareholder of S, a construction firm which has elected to be treated as a "subchapter S" corporation. In December 1964, S, which reports construction income on the percentage of completion method, agreed to complete the construction of a race track, and the construction was substantially completed in August 1965. As part of an agreement relating to such construction, S, in April and May 1965, received stock in M, the corporation owning the race track. S also was to receive a note for $1,250,000 payable in 3 years and bearing interest at the rate of 6 percent per annum. During 1965, M was in financial difficulty, and by December 31, its liabilities exceeded the fair market value of its assets by $1.2 million, it could not pay its debts, and it had no reasonable expectation of obtaining additional funds in the future. Held: (1) S is entitled to a partial bad debt loss during the year 1965 with regard to the account receivable relating to the construction contract; (2) S does not have to accrue interest on the account receivable during 1965; (3) S received more than a security interest in the transferred stock and realized income on its receipt; and (4) The stock *78 was worthless as of December 31, 1965. Joel Yonover, 3637 Grant St., Gary, Ind., for the petitioners. Bert L. Kahn, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion
*79 SIMPSON, Judge: The respondent determined a deficiency of $1,983.675.60 in the joint Federal income tax of the petitioners for 1965. The issues to be decided are: (1) Whether Shamrock Engineering, Inc., may treat any portion of the Midway Enterprises, Inc., account receivable as worthless on December 31, 1965; (2) whether interest income was accruable on the Midway account receivable; and (3) whether any income was recognizable by Shamrock on the receipt of the Midway stock, and if income was recognizable, whether the stock received was worthless as of December 31, 1965. Findings of Fact Some of the facts have been stipulated, and those facts are so found. The petitioners, Kenneth P. Harrington and Arola Harrington, are husband and wife and maintained their legal residence in Valparaiso, Indiana, at the time their petition was filed in this case. They filed their 1965 joint Federal income tax return with the district director of internal revenue, Indianapolis, Indiana. Mr. Harrington will sometimes be referred to as the petitioner. Mr. Harrington has been in the construction business for over 25 years, and he has been the principal officer and sole shareholder of Shamrock *80 Engineering, Inc. (Shamrock), since its incorporation in 1961. Shamrock is engaged principally in commercial, industrial, municipal, and underground construction, as opposed to residential construction. On its books and for Federal income tax purposes, Shamrock recorded income on the percentage of completion method. Income 889 was recorded monthly as earned and was based on engineer's estimates which were customarily made at the end of each month. In 1964, Shamrock elected to be treated for tax purposes as a small business corporation (subchapter S corporation). Shamrock undertook the completion of a track for horse racing in Colorado for Midway Enterprises, Inc. (Midway). Midway was incorporated in Colorado on February 28, 1963, and it was primarily organized for the purpose of operating tracks for horse racing with pari-mutuel betting. In Colorado, both horse and dog racing, which is the more popular form of racing, are regulated by the Colorado Racing Commission (the commission). The commission is composed of three members and an executive secretary, who serves as executive head of the commission. On or about March 15, 1963, Midway made an application to the commission for *81 25 racing dates for the 1964 season. The proposed location of the racing track was approximately 20 miles south of Colorado Springs and 20 miles north of Pueblo, and it fronted on Interstate Highway 25. In its application, Midway stated that it would cost $490,746 to build the track and that such costs would be paid for with the proceeds of a securities underwriting in the amount of $750,000. It also projected that $91,160 would be wagered daily at the track and that the track would have a profit of $2,288 for each day it operated. The application further indicated that although many of the Midway directors were horse owners, none had experience as race track operators. Following receipt of the application, the executive director of the commission, Mr. Christensen, made a feasibility study of the proposed track site; he projected that $55,000 would be wagered daily at the track and that the track would lose $7,000 each day it ran, and concluded that the track would be unsuccessful. After Mr. Christensen was informed by the Colorado Attorney General's office that the projected economic failure of the track was not a grounds for denying Midway a license, the commission conditionally *82 approved the Midway license. However, it did require Midway to post a $25,000 surety bond, rather than the normal $5,000 bond, and to hold $30,000 on deposit with the commission prior to any racing meet to secure the payment of expenses. Following the approval of the application, Midway purchased a 155-acre tract of land for $75,538.16 on which to build the track and entered into a contract with an architect to design the race track and prepare the necessary plans and blueprints. At about the same time, the initial subscribers of Midway common stock acquired 25,080 shares for $5 a share, and Midway purchased 320 acres of land adjoining the track site for $48,509, giving the seller 40 shares of stock in return for a credit of $200 against the purchase price. On or about November 15, 1963, Midway offered for sale 180,000 shares of its common stock at $5 per share in an attempt to raise, after commissions, $765,000. The proceeds were to be used to meet the $30,000 cash deposit requirement set by the commission and to construct the facilities required for racing. The offering circular stated that the $5 per share offering price was arbitrarily set, and Midway actually sold no more *83 than 5,455 of the 180,000 shares offered. Early in 1964, Midway contracted for the completion of the racing plant at a cost of $858,000. Previously, it had contracted with another company for the construction of the stable area. To acquire funds to build these facilities, Midway, between October 15, 1963, and March 15, 1964, borrowed $430,000, including $275,000 from the Arkansas Valley Bank (the bank) secured by a deed of trust on the entire track. During this period, it also repaid $150,000 in loans, and as a result, on March 15, 1964, its balance sheet showed total assets of $430,850 and total liabilities of $305,250. During that same month, Midway entered into a best-efforts underwriting agreement for the sale of 160,000 shares of its common stock and $800,000 of its debentures. In September 1964, the underwriting was terminated. Prior to such termination, $24,300 of debentures, 4,860 common shares of stock at $5 per share, and warrants for the purchase of 4,860 common shares had been sold. In late summer 1964, Mr. Harrington was asked if Shamrock would be interested in building a race track in the West, and after it received the preliminary plans and specifications for the *84 track, Shamrock expressed interest. Further discussions were held, and the petitioner was shown an alleged commitment letter of the Massachusetts Mutual Life Insurance Company (Massachusetts Mutual) for a $1,750,000 construction loan. During these discussions, Mr. Harrington requested a stock bonus for timely completion of the construction. On December 3, 890 1964, Shamrock sent a letter to Midway to confirm an agreement under which Shamrock agreed to advance funds to pay approximately $69,000 of Midway debts, and Midway agreed to enter into a contract with Shamrock for the construction of the racing plant at a cost not to exceed $1,320,000. In consideration for making such advances, Shamrock also was to receive an unspecified number of shares of Midway stock. On or about December 3, 1964, Shamrock issued a purchase order regarding the construction of the racing plant, and apparently some preliminary work was commenced in that month. On or about December 17, 1964, Mr. Harrington was informed that the commitment letter was fraudulent, and he so informed Midway on or before December 21, 1964. He was assured that either Massachusetts Mutual would honor the commitment letter or that *85 other financing would be found, and Shamrock continued in the project. By December 30, 1964, the home office of Massachusetts Mutual had decided not to honor the commitment. Before reaching an agreement with Shamrock, Midway had been forced to stop construction of its race track because of a shortage of funds, and it had not opened for the 1964 racing season. On November 24, 1964, the commission notified Midway that its application for the 1965 racing season was being denied, but granted it 30 days within which to meet the statutory requirements for renewal. On December 2, 1964, Mr. Harrington and officers of Midway attended an informal meeting of the commission at which Midway's plans to sell a controlling interest to Mr. Harrington were discussed. On December 21, 1964, the commission issued an order requiring the posting of a construction performance bond and a showing of financial responsibility by Shamrock and Midway. Soon thereafter, the attorney for Midway sent a series of letters to the commission assuring it that Midway had adequate financing and that a performance bond had been obtained. On February 2, 1965, Midway was granted a license for the 1965 racing season. Prior *86 to April 1, 1965, Midway was in need of working capital, and between January 1, 1965, and April 1, 1965, Shamrock made additional advances to or payments on behalf of Midway totaling $28,281. During the same period, Midway entered into an agreement with Berlo Vending Company (Berlo) under which Berlo was granted the exclusive right to all concessions for an annual stipulated sum. In addition, Berlo agreed to loan $150,000 to Midway, the loan to be secured by a second mortgage. At the beginning of April 1965, Midway entered into a contract with Shamrock, which provided that Shamrock would be paid $1,250,000 for completing the race track. The agreement was dated November 30, 1964, and it was approved by the Midway board of directors at their April 6, 1965, meeting. At that same board of directors meeting, Midway entered into another agreement with Shamrock, Mr. Harrington was elected to the Midway board of directors and then elected its chairman, and stock was issued to pay various debts. The agreement provided that whereas Midway owed Shamrock $1,250,000 for the construction of a race track, and whereas security was to be provided to Shamrock, Midway would execute a mortgage and mortgage *87 note in the amount of $1,250,000 payable in 3 years and bearing interest at the rate of 6 percent per annum. Such mortgage was to be subordinate to the $275,000 mortgage to the bank, and $725,000 of the mortgage was to be subordinate to the Berlo mortgage. Midway also agreed to issue 135,262 shares of its common stock to Shamrock immediately and 227,000 shares to Shamrock on May 3, 1965. The mortgage and the note were never executed, but the shares were issued. On April 12, 1965, and June 29, 1965, Shamrock transferred the Midway shares it had received to Mr. Harrington. In accounting for the contract, Shamrock on April 30, 1965, debited accounts receivable-Midway $1,046,544.83 and credited sales a like amount, and on August 31, 1965, Shamrock considered the track completed and debited accounts receivable-midway $380,477.71, including extras, and credited sales a like amount. The stock which was issued for debts at the April 6, 1965, meeting was issued at $5 per share, and included 5,000 shares which were issued to pay debts owed to directors. Another 6,491 shares were issued to pay a debt owed to the Farmer's Acceptance Corporation. On April 26, 1965, an additional 520 shares were *88 issued for costs incurred in building the track, and on May 28, 1965, 5,400 shares were issued to various Midway directors in order to raise $27,000. On May 7, 1965, the track opened, but the grandstand was not substantially completed until August 1965. On the opening day, Midway made an assignment of the concessionaire rents to Berlo, and the loan 891 from Berlo was completed. The proceeds of the loan were used to repay Shamrock for previous open account advances. During the 1965 season, 30 days of racing were held, 3 having been rained out, and 5 having been added when the rain prevented another track from racing. The average daily handle (that is, the amount wagered) during the 1965 racing season was approximately $47,250, and as of June 23, 1965, Midway was operating at a daily operating loss (before depreciation, interest, and deferred charges) of $5,764.16. On June 28, 1965, Midway borrowed an additional $150,000 from Berlo and gave Berlo its note, a deed of trust, and a second assignment of rents. On June 29, 1965, Mr. Harrington transferred 25,000 shares of Midway stock to Midway, and Midway debited Treasury stock $50,000 and credited surplus $50,000. Thereafter, Midway *89 sold over 13,000 of such shares at $2 a share and a director purchased 7,000 of these shares. In August of 1965, Shamrock paid $100,000 of the $275,000 note of Midway which was payable to the bank and obtained an extension until April 11, 1966, on the remainder of the debt. On August 31, 1965, Midway repaid $120,000 which Shamrock had advanced it on open account. Following this repayment, Midway's balance sheet showed $4,270 in current assets and $2,174,747 of total assets, as compared to current liabilities of $442,628 and total liabilities of $2,155,923. At that time, Midway's liabilities exceeded the fair market value of its assets. On or about November 5, 1965, the former contractor and the architect filed an action in United States District Court to foreclose mechanics liens in the amount of approximately $140,000. Because of the litigation, the bank, prior to December 31, 1965, demanded that the $175,000 still owing on the note to it be paid. On December 31, 1965, Midway's balance sheet showed current assets of $2,273 and total assets of $2,143,787, as compared to $484,530 of current liabilities and $2,197,825 of total liabilities. Its liabilities exceeded the fair market *90 value of its assets by over $1,200,000. Throughout 1965, the petitioner attempted to obtain third-party mortgage financing. In April and May, several financial institutions expressed an interest in financing the track, but none ultimately provided such financing. In July 1965, the petitioner hired a lawyer, who specialized in mortgage financing, to help him in his attempts to obtain mortgage money. They contacted banks, real estate brokers, insurance companies, and individuals, without success. The petitioner also attempted to sell his 85-percent stock interest in Midway and offered it for sale at a price of $1,750,000 in the Wall Street Journal of November 19, 1965, without success. As of December 31, 1965, the petitioner had abandoned any hope of acquiring additional funds for Midway. The 1966 racing season at Midway was financed by a director of Midway and by Shamrock. Due to a shortage of funds, the 1966 season lasted only 26 days. The average daily handle was $48,609.45, and the average daily operating deficit, before depreciation and interest, was $6,984.56. After the close of the 1966 season, the bank entered the district court litigation brought by the architect and the *91 former contractor and sought a foreclosure of its deed of trust. A judgment of foreclosure was entered on November 8, 1966, determining the priority of liens as follows: (1) The architect and the former contractor, $70,303.06; (2) the bank, $188,165.60; and (3) Berlo, $264,72.57. On December 28, 1966, the bank purchased the property for $261,100.06, the amount of its lien, the liens before it, and costs. On July 7, 1967, Berlo redeemed the track property from the Sheriff's sale for the sum of $269,456.73 and deeded the subject property to Midway. Midway granted to Berlo a first deed in trust with respect to said property, and a new lease was executed between Midway as lessor and Berlo as lessee. On the same day, Midway made a further assignment of rents to Berlo in connection with the first deed in trust; and Mr. Harrington and Shamrock jointly and severally guaranteed performance by Midway to Berlo. In 1968, Shamrock forgave all but $100,000 of its outstanding claims against Midway in the amount of $2,027,859 so that a public offering of Midway's stock at 80 cents per share could be made. On its 1965 Federal Small Business Corporation income tax return, Shamrock deducted $1,179,903.23 *92 as the costs it incurred in building the racing facility and included $400,000.00 in income from the project. It did not accrue any interest income on the Midway account receivable even though Midway accrued interest expense on the debt. Neither Shamrock nor the petitioners reported any income with respect to the receipt of the Midway stock. 892 In his notice of deficiency, the respondent determined that the total Midway contract price was $3,238,302.54, including $1,811,310.00 as the value of the 363,262 shares of Midway stock, and that the entire price was includable in Shamrock's income for 1965. He also determined that Shamrock should have accrued $58,802.28 of interest income on the Midway indebtedness. The respondent further determined that the petitioner had understated his distributive share of Shamrock's income by $2,898.011.31. Opinion The basic issues for decision are: (1) Whether any portion of the Midway account was worthless as of December 31, 1965; (2) whether interest income was accruable on the Midway account receivable; and (3) whether any income was recognizable by Shamrock on the receipt of the Midway stock, and if income was recognizable, whether the stock *93 received was worthless as of December 31, 1965. Section 166(a)(2) of the Internal Revenue Code of 1954 provides that: When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This section gives the respondent discretion in determining the availability of a deduction for partial worthlessness of a debt. Portland Manufacturing Co., 56 T.C. 58, 72-73 (1971). However, this discretion is not absolute, and, where the facts clearly indicate the "sagacity" of the taxpayer's business judgment in charging off a portion of the debt, it will be held that the respondent abused his discretion. Portland Manufacturing Co., supra, at 72-73. We believe that such facts are present in this case. As early as 1963, the secretary of the state racing commission had predicted that the track would fail, and, in 1963 and 1964, the Midway stock offerings had been significant failures. During 1965, Midway's financial position *94 progressively worsened. In April, the construction contract was executed even though mortgage funds had not been obtained. The first racing season ended in July, and operating losses averaged approximately $5,700 per day. By August 1965, Midway's liabilities exceeded the fair market value of its assets, and Mr. Harrington had not succeeded in his attempts to obtain mortgage financing. In November, a suit was filed to foreclose liens against the track, and as a result, the bank demanded payment of the $175,000 which was owing to it. On December 31, 1965, Midway had $2,273 of current assets and did not have the funds to pay the bank's claim or the claims being asserted in the court action. Furthermore, as of December 31, after extensive efforts to obtain financing, the petitioner decided that there was no hope of obtaining additional funds for Midway, and we find that he was reasonable in that belief. In addition, Midway could not reasonably expect income from its operations in the near future; there was good reason to doubt whether Midway could ever operate successfully. Moreover, as Mr. Christensen testified, a track is doing well if it breaks even in 3 years, and one of the other *95 2 commercial horse racing tracks in the State had been operating at a loss for over 20 years. Finally, the liabilities exceeded the fair market value of the assets by over $1.2 million. Not only have the petitioners shown that Midway could not pay its debts on December 31, 1965, that its liabilities exceeded both the book value and the fair market value of its assets, and that there was no reasonable hope for additional funds or for earning income in the foreseeable future, but they have also shown that the claimed bad debt deduction was reasonable in amount. If prior claims are subtracted from the fair market value of the assets, $326,810 would remain to pay the debt to Shamrock. If the claimed bad debt deduction is subtracted from the amount due to Shamrock on the contract, an account receivable of $400,000 would remain for tax purposes. Without doubt, the Midway account receivable became worthless at some time in 1965, 1966, or 1967. The respondent contended that the advances made in 1966 by Shamrock indicate that the contract debt was collectible as of December 31, 1965. However, it appears that these advances were nothing more than an attempt to keep alive a hope of realization *96 on the account. See Krueger Broughton Lumber Co., 18 B.T.A. 1270 (1930). Considering all the evidence, we are convinced that Shamrock had good reasons for treating the Midway account receivable as partially worthless in 1965, and we, therefore, hold that the respondent abused his discretion in denying Shamrock a bad debt deduction. 893 Because we reach this holding, we need not discuss the petitioner's alternative contention that only $400,000 of the Midway account receivable was includable in the gross income of Shamrock. Both parties assume that Shamrock reports its interest income under the accrual method of accounting and seem to agree that if any accrual of the Midway account interest income is required for 1965, the date of such accrual is December 31, 1965. For interest income to be accruable, there must be a reasonable expectancy, at the time of the accrual, of receiving the interest. Chicago & North Western Railway Co., 29 T.C. 989 (1958). See 2 Mertens, Law of Federal Income Taxation, sec. 12.95 (1967). In the present case, we find that no such *97 expectancy existed. The debtor did not have the funds to pay its current debts, its liabilities exceeded the fair market value of its assets by over $1.2 million, and there was no reasonable expectation that the track would be profitable in the future or that proper financing could be found. In short, there was simply no source of funds from which it was reasonable to expect that interest would be paid, and accordingly, we hold that Shamrock was not required to include the interest in its gross income for 1965. The third issue to be decided involves the determinations of whether Shamrock received more than a security interest in the Midway stock which was transferred to it, what was the value of the transferred shares, and whether the shares were worthless as of December 31, 1965. The petitioner contends that the stock was transferred to Shamrock as security for the performance of Midway's promise to pay for the construction of the track. However, there were no apparent restrictions on Shamrock's ownership and control of the stock. Indeed, Midway had previously attempted to have Shamrock accept stock as compensation for building the racing track, and the corporate minutes of Shamrock *98 indicate that thhe stock was received as compensation. Furthermore, Shamrock transferred the stock to the petitioner, and he advertised it as his own stock. Even the Midway corporate minutes refer to attempts to sell Mr. Harrington's stock. In addition, when Mr. Harrington transferred 25,000 of the shares back to Midway, Midway credited donated surplus, thus indicating that Mr. Harrington had owned the stock. In light of the financial condition of Midway, it appears that both Midway and Shamrock recognized that Midway's promise to pay $1,250,000 for the construction of the track was not worth its face amount and that, therefore, in addition to the note, the stock was transferred to Shamrock as compensation for its performance of the construction contract. Under these circumstances, we consider Mr. Harrington's testimony that he would have returned the stock if the debt was paid as nothing more than an indication that the other owners of Midway could repurchase the stock by paying the debt owed to Shamrock. We, therefore, conclude that Shamrock received more than a security interest in the stock. The parties have agreed that if Shamrock received more than a security interest in the *99 stock, it would be taxable on the receipt of the stock to the extent of its fair market value. They further agree that the fair market value on April 6, 1965, when the first block was transferred, and on May 3, 1965, when the second block was transferred, was the same. However, the respondent contends that such value was $5 per share, and the petitioner argues that it was zero. We reject both these contentions. If the shares were worth $5 per share, the transferred stock would have been worth over $1,800,000. Yet, clearly, Shamrock was not entitled to this amount in addition to the promise to pay $1,250,000 which it received for completing the track. Nor do we believe that any reasonable investor would pay $1,800,000 for control of a corporation whose assets were worth less than $1,000,000, whose liabilities exceeded $2,000,000, and whose earning power was unproven. Furthermore, the sales of 50,000 shares at $5 per share, upon which the respondent relies, are not indicative of fair market value as of April or May of 1965. Over 25,000 of the shares were sold to the initial subscribers in 1963 before Shamrock had begun to build the race track or encounter any of its financial difficulties. *100 Another 10,000 shares were sold pursuant to public offerings in 1963 and 1964 in which less than 5 percent of the offered shares were sold. Another 10,000 shares were sold to directors and officers of Midway to repay loans that they had made. Still another 6,000 shares were issued to pay a debt owed to a nondirector-creditor, but considering the financial condition of Midway when these shares were issued in April 1965, and the number of shares transferred, such sale does not accurately represent the fair 894 market value of the stock transferred to Shamrock. The petitioners have also failed to support their suggested valuation. After June 29, 1965, over 5,000 shares were sold to the public at $2 per share. Although these shares were sold in blocks much smaller than those transferred to Shamrock and are not conclusive in determining the exact value of the stock in question ( Robertson v. Routzahn, 75 F. 2d 537 (C.A. 6, 1935), they do indicate that the stock had some value. Additional evidence indicating value includes the fact that the directors accepted stock in satisfaction of their claims, rather than forgive the debts, that when Mr. Harrington transferred 25,000 *101 shares to Midway, Midway debited its outstanding stock account $50,000 and credited donated surplus a like amount, and that Shamrock's minutes stated that the stock was compensation for services rendered. Furthermore, although Midway was in financial difficulty in April, there was still some hope for success. The first racing season had not yet begun. Several financial institutions were then considering financing the track. A major source of Midway's financial problems was its inexperienced management, and with the transfer of the Midway stock, Shamrock and Mr. Harrington apparently had the power to change this management. Considering all the evidence, including the financial condition of Midway and the size of the two blocks of stock which were issued, we find that the value of the stock in each block at the time of issuance was 50 cents per share. Such a valuation results in the conclusion that Shamrock received stock worth $181,131, in addition to the note in the amount of $1,250,000, as compensation for constructing the track. The final issue to be decided is whether the Midway stock was totally worthless as of December 31, 1965, so as to entitle the petitioner to a loss *102 deduction for the stock which he held. Sec. 165(g)(1), Int. Rev. Code of 1954. After carefully examining the evidence, we find that as of December 31, 1965, the Midway stock was totally worthless. At that time, Midway could not pay its debts, its liabilities exceeded its assets by over $1,200,000, and as pointed out earlier, there was no reasonable expectation of future funds or profits. The respondent, however, points to the fact that the business continued to operate after 1965 as an indication that the stock was not worthless in 1965. Yet, the continued operation of a business does not itself prove value in its stock. Chares W. Steadman, 50 T.C. 369 (1968), affd. 424 F. 2d 1 (C.A. 6, 1970), cert. denied 400 U.S. 869 (1970); Frank C. Rand, 40 B.T.A. 233 (1939), affd. 116 F. 2d 929 (C.A. 8, 1941), cert. denied 313 U.S. 594 (1941). Nor does Mr. Harrington's offering to sell the stock in November of 1965 for $1,750,000 indicate that the stock had value at that time. He received no offers *103 to purchase it at that price, and considering the financial condition of Midway, we find it impossible to believe that he really hoped to receive any offers. Clealy, the stock became worthless at some time, and the petitioner had a reasonable basis for determining that the stock was wholly worthless in 1965. Although some Midway stock was sold to the public in 1968 at 80 cents per chare, the sales occurred only after approximately $2,000,000 of the debts owed to Midway were forgiven, and such sales therefore do not indicate that the stock had value as of December 31, 1965. Ainsley Corporation v. Commissioner, 332 F. 2d 555 (C.A. 9, 1964), revg. on another point a Memorandum Opinion of this Court. Hence, we find that the stock was worthless in that year and hold that the petitioners are entitled to a loss deduction with respect to the stock. On December 31, 1965, the stock was held by Mr. Harrington, and as the petitioner has presented no sound reasons for permitting Mr. Harrington an ordinary loss deduction, we hold that he is entitled to only a capital loss deduction. Decision will be entered under Rule 50. 89595