ESTATE OF MARIA IACONO, ROSE GIUSTI and HELEN REESE, CO-EXECUTRICES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Iacono v. Commissioner
Docket No. 7287-79.
United States Tax Court
T.C. Memo 1980-520; 1980 Tax Ct. Memo LEXIS 58; 41 T.C.M. (CCH) 407; T.C.M. (RIA) 80520; November 25, 1980, Filed Charles A. Lane, for the petitioners. Milton B. Blouke, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal estate tax of the Estate of Maria Iacono, Decedent, Rose Giusti and Helen Reese, Co-Executrices, in the amount of $81,315. By an Amendment to Answer respondent alleged an increased deficiency in the estate tax in the amount of $52,614, for a total deficiency of $133,929. The issues for decision are: (1) the fair market value on January 11, 1977, of Maria Iacono's undivided one-quarter interest in the *59 property located at 1125B Sir Francis Drake Boulevard, Kentfield, California; (2) the fair market value on January 11, 1977, of Maria Iacono's undivided one-half interest in property located at 724 Battery Street, San Francisco, California; and (3) the fair market value on January 11, 1977, of Maria Iacono's undivided one-half interest in property located at 465 Cabot Road, South San Francisco, California. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Rose Giusti, Co-Executrix of the Estate of Maria Iacono, resided in San Francisoc, California, at the time of the filing of the petition in this case. Helen Reese, Co-Executrix of the Estate of Maria Iacono, resided in Novato, California, at the time of the filing of the petition in this case. The Co-Executrixes are decedent's daughters. A timely estate tax return (Form 706) was filed on behalf of the Estate of Maria Iacono with the Internal Revenue Service Center, Fresno, California. Maria Iacono, decedent, died on January 11, 1977. At the time of her death, Ms. Iacono was a resident of the City and County of San Francisco, California. On the date of her death, decedent owned an undivided *60 one-quarter interest in property located at 1125B Sir Francis Drake Boulevard, Kentfield, California (Sir Francis Drake property).This property was subject to a lease dated January 3, 1973, and an Option to Purchase dated January 3, 1973. For a term of 20 years commencing January 1, 1973, lessors Russell Reese, Helen Reese, Maria Iacono, and Rose Giusti agreed to rent the Sir Francis Drake property to Smokers Deconditioning Clinic, Inc. d/b/a Western Rehabilitation Centers II. Dr. Glasser signed the lease on behalf of the named lessee. Thereunder, the lessee was to operate the Center Medical and Rehabilitation Hospital as a licensed "medical, surgical hospital, extended care facility, rehabilitation center, pharmacy and other medical and related activities." The lease provisions required that the lessee maintain and repair the premises at its own cost. The lease also required that the lessee pay rent to the lessors pursuant to the following scheduled terms: Rent shall be payable in advance upon the 1st day of each calendar month. The monthly rent for the first 3 months of the term shall be $3,136.00; the monthly rent for the next 9 months shall be $5,870.00; the monthly rent *61 for the next 48 months shall be $7,570.00; the monthly rent for the next 60 months shall be $7,570.00 plus $5.00 multiplied by the number of licensed beds on the premises at the end of the 5th year of the term; the monthly rent for the 121st month through the 180th month shall be the same as the rent for the 61st through 120th months plus an additional $5.00 for each licensed bed on the premises at the end of the tenth year of the term; and the rent for the last 60 months shall be equal to the monthly rent for the 121st through the 180th months of the lease term plus an additional sum of $5.00 multiplied by the number of licensed beds on the premises at the end of the 15th year of the term. At the time of decedent's death the effective monthly rental was $7,570. Based on a 99-bed capacity, the stated rental schedule provided for a rental increase to $8,065 per month effective as of October 1977. The Option to Purchase agreement between the Sir Francis Drake property lessors, as optionors, and lessee, as optionee, granted to the optionee an option to purchase all real and personal property located at 1125B Sir Francis Drake Boulevard. Thereunder the optionee had the choice of *62 exercising the purchase option at any time prior to the expiration of the afore-described lease. The Option to Purchase set forth an option price schedule, as follows: (a) If exercised during the first five years of the term of the lease, $1,100,000.00. (b) If exercised during the second five years of the term of the lease, $1,200,000.00. (c) If exercised during the third five years of the term of the lease, $1,300,000.00. (d) If exercised thereafter, $1,400,000.00. Prior to the death of decedent, the optionee had not exercised its purchase option on the Sir Francis Drake property. On January 11, 1977, the optionee could have exercised the purchase option for $1,100,000. The Sir Francis Drake property is composed of 6 parcels of land, 3 of which are located in Kentfield, Marin County, California, and 3 parcels of which are located in Ross, Marin County, California. All parcels, with total land area of approximately 74,555 square feet, are zoned for residential use. The subject property was valued for California real estate tax purposes for 1976-1977 as follows: Tax Rate
Marin Co.
$100 Assessed
Parcel No.
Value
Land
Improvements
Total
074-011-048
$10.768
$ 8,000
0
$ 8,000
074-011-056
10.768
6,500
0
6,500
074-011-074
9.866
13,750
$34,250
48,000
074-011-076
9.866
34,250
78,750
113,000
074-011-080
9.866
812
0
812
074-011-081
10.768
375
0
375
*63 For 1976-1977 the California real estate taxes for the Sir Francis Drake property approximated $17,566. Two of the six parcels of Marin County land are improved with a one-story wood-framed structure originally constructed in 1963 as a convalescent hospital. This facility was utilized by the lessee primarily as a rehabilitation hospital at the time of decedent's death. The hospital facility was constructed on landfill, and as a result of settlement, the building has incurred some damage to its foundation and structural components. The structure contains patient rooms, nurse stations, kitchen, pharmacy, therapy rooms, dining areas, office space, laboratory, x-ray room, and a semi-furnished basement. The building contains a total area of 26,814 square feet, of which 13,050 square feet constitutes the basement. The facility was licensed for 27 medical/surgical beds and 72 skilled nursing beds, for a total licensed capacity of 99 beds. At the time of decedent's death, the lessee had applied to the appropriate California authority for permission to reduce the licensed bed capacity to 66 beds. The subject property is located in the general area of several other medical and hospital *64 facilities. The immediate vicinity includes a mixture of single-family and multi-family residential dwellings.Access to the Sir Francis Drake property is gained by Sir Francis Drake Boulevard, a busy thoroughfare. At the time of her death, Maria Iacono owned an undivided one-half interest in 724 Battery Street, San Francisco, California (Battery Street property). For a term of 10 years commencing on December 1, 1967, Russell O. Reese, Maria Iacono, and Helen I. Reese, as lessors, rented this property to Henry Calvin Fabrics, Inc. Pursuant to the terms of the lease, the lessee was obligated to pay monthly rental pursuant to the following schedule: One Thousand One Hundred ($1100) Dollars upon the execution and delivery of the lease, receipt of which is hereby acknowledged, being te rental for the first month of the lease (December, 1967); One Thousand One Hundred ($1100) Dollars on the 1st day of January, 1968; and One Thousand One Hundred ($1100) Dollars on the 1st day of each and every succeeding calendar month until the whole of said sum of One Hundred Thirty-Two Thousand ($132,000) Dollars shall have been paid. Additionally, the lease required that the lessee pay for *65 the maintenance and repair of the premises, excepting exterior walls, roof, and foundation. In a lease dated January 5, 1977, but not executed until after decedent's death, Russell O. Reese, Helen Reese, and Rose Giusti, as lessors, agreed to lease to Henry Calvin Fabrics, Inc., the Battery Street property for a term of 10 years commencing on December 1, 1977. Pursuant to the lease, the lessee agreed to pay a total rent of $237,000 in installments as follows: One Thousand Nine Hundred Seventy-Five ($1975) Dollars on the first day of December 1977; One Thousand Nine Hundred Seventy [Sic] ($1975) Dollars on the first day of January, 1978; and One Thousand Nine Hundred Seventy-Five ($1975) Dollars on the first day of each and every succeeding calendar month until the whole of said sum of Two Hundred Thirty-Seven Thousand ($237,000) Dollars shall have been paid. Both the 1967 and 1977 leases stated that the lessee would use the property for the sale, warehousing and distribution of fabrics, materials, decorative and related items. The 724 Battery Street parcel of land is 40 feet wide by 137.5 feet deep, for a total area of 5,500 square feet. The lot is not a corner lot; however, *66 the parcels on both sides of 724 Battery Street are not improved. The subject property is improved with a two-story plus basement brick building constructed around the turn of the century. The upper two floors contain 10,552 square feet of space, and the basement includes 5,500 square feet. The general vicinity surrounding the subject property is Jackson Square, an historic neighborhood situated on the northern side of the San Francisco financial district. Jackson Square, once part of the Barbary Coast, is one of the portions of downtown San Francisco not destroyed by the disastrous earthquake and fires of 1906. The turn-of-the-century buildings located in Jackson Square are in the process of renovation for occupancy by such businesses as wholesale furniture dealers, antique shops, interior decorators, architechts and designers, attorneys, graphic companies, and advertising agencies. The first floor of 724 Battery Street contains a small reception area approached by a storefront entrance. The remainder of the first floor space is predominantly a storage area with a 15-foot clearance. The floor is concrete, covering some type of soft wood. The second floor contains office *67 areas, open work space, a storage area, and restroom facilities. Numerous skylights pocket the second story. The basement has concrete flooring and a wood-beamed ceiling with 8.5-foot clearance. The basement walls are reinforced concrete and the columns are steel. An elevator shaft runs from the basement to the second story. The elevator has a 2,500 pound capacity and measures 6 feet by 7 feet. At the time of her death, decedent also owned an undivided one-half interest in 465 Cabot Road, South San Francisco, California (Cabot Road property). This property is located in the Cabot, Cabot & Forbes Park, which is situated north of San Francisco International Airport, east of the Bayshore Freeway, and south of downtown San Francisco. The Cabot Road property contains approximately 69,700 square feet. This property is zoned by the City of South San Francisco as M-2-H, heavy industrial property. The site is improved with a one-story plus mezzanine concrete structure, housing approximately 25,000 square feet. On October 1, 1967, Russell O. Reese, Helen I. Reese, and Maria Iacono, as lessors, agreed to lease to Sonoma Mission Creamery Company the Cabot Road property. The lease *68 commenced on October 1, 1967, for a term of 20 years for use by lessee as a warehouse, manufacturing, and distribution business of dairy and related products. The lease provided for a total rent of $828,000, payable in installments as follows: Three Thousand Four Hundred Fifty ($3450) Dollars upon the execution and delivery of this lease, receipt of which is hereby acknowledged, being the rental for the first month of the lease (October, 1967); Three Thousand Four Hundred Fifty ($3450) Dollars on the first day of November, 1967, and Three Thousand Four Hundred Fifty ($3450) Dollars on the first day of each and every succeeding calendar month until the whole of said sum of Eight Hundred Twenty-Eight Thousand ($828,000) Dollars shall have been paid. Pursuant to the lease terms, the lessee was to maintain and repair the premises, including the exterior walls, roof, and foundation. Paragraph 29 of the lease provided as follows-- 29. The monthly rental of $3450 is based upon the purchasing power of the dollar as measured by the United States Bureau of Labor Statistics monthly Consumers price index for the San Francisco Bay Area for June, 1967, which shows an Index Figure of *69 118.4 (1957-1959 = 100). At each succeeding five-year anniversary of the lease commencement date, the then-current Index figure as shown by the most recently released monthly Index shall be ascertained. If, on said date, said current Index figure has increased the monthly rental for the premises shall thereupon be increased by the same percentage as said Index figure has increased above 118.4. Should said Consumers price index be discontinued or revised by the Bureau of Labor Statistrics, the formula above provided shall be converted to any new or changed Index in accordance with principles released by said Bureau to the end that rental for the term hereof will be increased in proportion to increases in the cost of living. By a lease addendum, dated June 1, 1969, the lessors and the lessee agreed to amend the October 1, 1967, lease to increase the rent-- effective June 1, 1969, to a sum of Three Thousand Eight Hundred ($3800) Dollars per month payable on the first day of June 1969, and Three Thousand Eight Hundred ($3800) Dollars on the first day of each and every succeeding calendar month until the whole of said sum of Eight Hundred Thirty-Six Thousand ($836,000) Dollars shall *70 have been paid. All of the other terms, covenants and conditions of said Lease remain unchanged. Again on November 1, 1970, the lessors and lessee entered into a lease addendum to increase the rental price of 465 Cabot Road. The November 1, 1970, lease addendum stated: 1. The rental is increased effective November 1, 1970, to a sum of Four Thousand Six Hundred ($4600) Dollars per month payable on the first day of November 1970, and Four Thousand Six Hundred ($4600) Dollars on the first day of each and every succeeding calendar month until the whole of said sum of Nine Hundred Thirty-Three Thousand, Eight Hundred ($933,800) Dollars shall have been paid. All of the other terms, covenants and conditions of said Lease remain unchanged. These two rent increases provided for in the addenda of June 1, 1969, and November 1, 1970, were made as a result of the lessors' having improved the building at their cost on behalf of the lessee. The rent increases were estimated as a return of approximately 9.2 percent per year on the cost of the improvements. Based on the increase in the cost of living index as set forth in paragraph 29 of the lease, in September or October 1972 the first *71 such adjustment increased the rent to $5,800 per month. This $5,800 per month rental remained in effect until approximately October 1977. A cost of living increase as provided in paragraph 29 of the lease was to become effective in September 1977. Based on the cost of living factor provided for in paragraph 29 of the lease, the rent was increased to $7,000 per month in September or October 1977. Russell O. Reese and Helen I. Reese Owner a 50 percent interest in Sonoma Mission Creamery Company; the remaining 50 percent interest is owned by Wilsey Foods Company. In 1976 and 1977 Sonoma Mission Creamery Company was a profitable business and was considered a good credit risk. The Cabot Road structure, built in 1967 to house the lessee's business operations, includes approximately 24,700 square feet. Of that floor space, approximately 3,000 square feet to 3,400 square feet is dedicated to office space; approximately 5,800 square feet contains two coolers; 1,325 square feet contains a freezer; and the remaining portion includes a mezzanine, open warehouse space and production area. The cold storage area includes two cooler rooms, the larger of which has stud walls with a vinyl *72 interior cover with a polyethylene insulation. Cool air is provided to that area by two ceiling-mounted freezer units and two blower units. The smaller cooler room has the special feature of a laminated beam roof below a 2-inch rigid Styrofoam insulation cushioned between plywood and a felt cover. The temperature in these cooler areas ranges between 38 degrees and the low 40's. The freezer area, having interior walls and ceiling of marine plywood with the polyethylene insulation material in addition to special insulating materials in the floor, maintains a temperature range of 0 to 5 degrees below Fahrenheit. The structure has several roll-up, dock-high doors on the east and west sides of the building. Along the easterly side is a full-length, concrete loading dock where large trucks may park for loading of the creamery products. The Cabot Road property is located in one of the few industrial areas near the downtown sector of San Francisco. Access to the expressway is approximately one and one-half miles from the Cabot Road property. The subject property has an available rail spur. From 1976 to 1977 the Cabot Road property was assessed by the San Mateo County Assessor's *73 Office. The total assessed value of $134,850 was divided between the land and improvements, with assessments of $47,750 and $87,100, respectively. At a tax rate of $8.7295 per $100 of assessed value the 1976-1977 annual real property taxes amounted to $11,772. On the estate tax return of Maria Iacono the interests of decedent in the properties in issue were reported as follows: One-quarter interest in 1125B Sir Francis Drake Boulevard, $197,500; one-half interest in 725 [sic] Battery Street, $118,500; and one-half interest in 465 Cabot Road, $291,000. [1] *74 Petitioners reported these same valuations for California State inheritance tax purposes, which the state authorities apparently have not challenged. Citing Estate of Claflin v. Commissioner,2 B.T.A. 126 (1925), and Estate of Barclay v. Commissioner,2 B.T.A. 696 (1925), respondent asserts that the application of a discount factor in the instant case is inappropriate. The cases cited by respondent hold that unless a taxpayer offers evidence that partial interests in real property sell for less than their proportionate shares of the entire values of the properties, no discount factor will be applied. The Estate of Barclay case gives as an example of such evidence actual sales comparables involving undivided fractional interests in properties where the sales prices realized for the fractional interests are less than aliquot portions of the values of the entire parcels. Petitioner in this case has offered no evidence to support the contention that decedent's partial interests if sold would bring less than their aliquot portions of the values of the entire properties. [3]
*75 Because of petitioners' failure to prove otherwise, we conclude that decedent's fractional undivided interests in the subject properties should be valued as fractions of the values of the entire parcels and that a discount factor is inapplicable. Because decedent owned a one-quarter interest in 1125B Sir Francis Drake Boulevard, the value of decedent's interest therein on January 11, 1977, was $225,000. The next property at issue is located at 724 Battery Street, San Francisco, California. This site, composed of 5,500 square feet, is improved with a two-story plus basement brick building constructed around the turn of the century. This building includes 10,552 square feet of floor space on its first and second stories and 5,500 square feet in its basement. The structure, originally constructed as a warehouse, was remodeled at the date of decedent's death by the tenant, Henry Calvin Fabrics, Inc., for use as a warehousing, distribution, and sales area for fabrics, materials, and related items. Mr. Haley and Mr. Gimmy each appraised the Battery Street property as of January 11, 1977, by utilizing the income and market data approaches. Mr. Haley appraised the Battery Street *76 property as of January 11, 1977, at $264,000, and Mr. Gimmy concluded that the value of the subject property was $645,000. In applying the market data approach Mr. Haley gathered information on seven properties sold between 1975 and 1977 which he considered comparable. The sales prices of the structures that Mr. Haley chose as comparisons ranged from $155,000 to $462,000, or, figured on a square footage basis, $24.69 to $45.98 per square foot. After analyzing each of the sales and comparing them to the subject property, Mr. Haley adjusted the amounts for differences in size, location, date of sale, quality and condition of improvements, and overall desirability. He concluded that the market data approach yielded a value of $25 per square foot of building area, excluding the basement. This appraisal resulted in a total value of $265,000. Utilizing the income approach, Mr. Haley gathered information on the leases of eight properties in the vicinity of the Battery Street property. Mr. Haley compared the subject property to those eight buildings with regard to square footage, rental rates, services included in the rental rates, amenities of each of the buildings, and the condition *77 of each of the structures. Based upon the rental information gathered on the eight properties, Mr. Haley determined that the appropriate fair rental value of the Battery Street property on January 11, 1977, was 20 cents per square foot or $2,120 per month, for a total of $25,440 per year. In determining that rental figure, Mr. Haley considered the information on the comparables plus the special qualities of the subject property, including the unfinished loft space, the full basement with a low ceiling which was without heat or windows, and the presence of a small reception area on the ground floor. Mr. Haley also considered the fact that under the lease effective on January 11, 1977, the lessor was responsible for maintaining the structure's foundation, structural members, roof, and exterior walls. Based upon sales data obtained while appraising income producing property located in the Bay area in early 1977, Mr. Haley noted that at that time the capitalization rates for such property were in the range of 9 percent to 10 percent. Taking into account the strong demand for income producing properties in San Francisco, the age of the subject structure, its condition, and its "not *78 prime location," Mr. Haley concluded that the capitalization rate appropriate for the Battery Street property was 9 percent. By applying this capitalization rate to the annual net income, Mr. Haley appraised the property pursuant to the income approach at $282,500. In correlating the results of the market data and income approaches, Mr. Haley determined that the fair market value of 724 Battery Street as of January 11, 1977, was $275,000. Mr. Haley then determined that the value of the leased fee estate, as rented under the lease agreement effective on the date in issue, was worth $145 per month less than his estimate of the monthly fair rental value of the property. Therefore, Mr. Haley determined that on an annualized basis the lessee's interest in the property was worth $11,000. Mr. Haley subtracted this amount from the fair market value of the property otherwise determined and arrived at an adjusted fair market value of $264,000. As with the Sir Francis Drake property Mr. Haley considered decedent's one-half undivided interest in the Battery Street property to be worth less than the decedent's aliquot portion of the whole property. Therefore, Mr. Haley applied a discount *79 factor of 10 percent, and he concluded that the value on January 11, 1977, of decedent's one-half undivided interest in the Battery Street property was $119,000. Mr. Gimmy utilized both the market data approach and the income approach in his appraisal of the Battery Street property.Mr. Gimmy selected as comparatives eight buildings in the Jackson Square area which sold from February 1976 to December 1978 for prices ranging between $95,000 and $1,700,000. Several of the eight structures had been partially or fully renovated to include some finished office and commercial space, while other buildings had not been renovated to any degree.Mr. Gimmy calculated the sales price per square foot for each of the eight buildings which he considered comparable.To determine the value of the subject property these results were adjusted by several factors to account for differences in condition, size, location, amenities, and date of sale. Pursuant to the market data approach Mr. Gimmy concluded that as of January 11, 1977, the appropriate fair market value of 724 Battery Street was $40 per square foot, for a total value of $642,000. Pursuant to the income approach Mr. Gimmy evaluated the *80 lease existing on the Battery Street jproperty on January 11, 1977. He judged that the monthly rental of $1,100, as provided in that lease, was substantially below market rentals in the Jackson Square area in January 1977. Mr. Gimmy noted that the existing lease was to expire automatically in November 1977, at which time the tenant had the option to negotiate a new rental rate with the lessors. Without setting forth any information on leases existing for comparable buildings, Mr. Gimmy suggested that the fair rental rate for the subject property would have been 30 cents per square foot on January 11, 1977. At trial Mr. Gimmy sought to support this conclusion by testifying that rentals in the historic Jackson Square area in early 1977 ranged between 30 cents and $1 per square foot. Based on his determination that the subject property could be rented at 30 cents per square foot, Mr. Gimmy calculated the annual gross income realizable to be $57,592. Mr. Gimmy adjusted that amount for vacancy and collection loss and expenses of exterior maintenance, reserves, and management. He then applied an 8 percent capitalization rate to the resulting net income of $55,070. This computation *81 produced the amount of $688,375. At trial Mr. Gimmy explained that the 8 percent capitalization rate was selected as a conservative figure since most Jackson Square buildings, which were rapidly appreciating in value, were capitalized at a rate of between 4 percent and 8 percent. Mr. Gimmy then adjusted the $688,375 by $41,003, an amount he attributed to the worth of the existing leasehold interest in the subject property. Pursuant to the income approach, Mr. Gimmy's final valuation of the Battery Street property was $647,000. As a final step Mr. Gimmy correlated the figures determined under each of the approaches. He concluded that the fair market value on January 11, 1977, of 724 battery Street was $645,000. Respondent argues that those properties chosen by Mr. Haley as comparable to 724 Battery Street were in fact not comparable. Additionally, respondent asserts that Mr. Haley wrongly ignored the subject building's conversion potential into office space by valuing the property for use as loft space. On the other hand, petitioners assert that Mr. Gimmy's appraisal approach was speculative.They defend Mr. Haley by stating that he appropriately confined his appraisal to *82 the property on January 11, 1977.As a result, they contend that Mr. Haley's considering the subject property as warehouse space with cosmetic improvements and his recognition of the existing lease was the proper method of appraising the property. Petitioners additionally argue that unlike Mr. Haley, Mr. Gimmy incorrectly assumed that the two leases on the Battery Street property, dated August 1967 and January 5, 1977, were negotiated by an uninformed lessor, namely Mr. Reese. Petitioners point out that Mr. Reese testified that these leases were negotiated with the assistance of a real estate broker. In the statutory notice of deficiency, respondent valued decedent's undivided one-half interest in the subject property at $163,900 based upon a fair market value of the whole property of $327,800.On February 15, 1980, Mr. Gimmy supplied respondent his final appraisal report which valued the Battery Street property at $640,000. Respondent filed an Amendment to Answer alleging the value of decedent's undivided one-half interest to be $320,000, an increase of $156,100. Respondent has the burden *83 of proving that petitioners' taxable estate is understated by this increased amount. Rule 142(a), Tax Court Rules of Practice and Procedure.
Considering the testimony of each of the experts and the sales which each of them used as comparables, we conclude that the fair market value of 724 Battery Street on January 11, 1977, was the $30 a square foot determined by Mr. Gimmy for the portions of the building other than the basement and the $25 a square foot determined by Mr. Haley for the basement area. This results in a fair market value of $454,000. [4] This value of $454,000 is supported by the rental approach using the 30 cents a square foot determined by Mr. Gimmy which we consider reasonable on the record for the nonbasement area of the building and a rental of half that amount or 15 cents a square fot for the basement area, capitalized at 10 percent and adjusted for a reasonable amount for the existing lease. On the record as a whole we conclude that the fair market value of 724 Battery Street on January 11, 1977, was $454,000. Because decedent owned a one-half undivided interest in the subject property, the value of her share of the property at January 11, 1977, was $227,000. *84 The final property at issue is located at 465 Cabot Road, South San Francisco, California. This site contains approximately 69,700 square feet and is improved with a one-story plus mezzanine concrete structure, containing approximately 25,000 square feet of space, including cooler and freezer space totaling 8,100 square feet. The building was constructed in 1967 for Sonoma Mission Creamery Company, which leases the building pursuant to a 20-year lease that commenced on October 1, 1967. The lease provides that the lessee may use the structure as a warehouse, manufacturing, and distribution business of dairy and related products. Mr. Haley appraised the property under the assumption that the highest and best use would be as "a warehouse or light manufacturing use that utilizes some or all of the cooler and freezer improvements located in the structure." Mr. Haley determined that in the past number of years the demand to buy, rather than lease, a structure with such refrigeration space has increased *85 due to concern with the storage and processing of meats, cheeses, and pharmaceuticals. Mr. Haley noted that although the cooler and freezer improvements would be valuable to a potential buyer, the machinery and processes utilized by the current tenant were basically obsolete as of January 1977. In appraising the value of the Cabot Road property Mr. Haley utilized the market data and income approaches.Pursuant to the market data approach Mr. Haley selected as comparables six structures located in the Cabot, Cabot & Forbes Park. With the exception of one building, none of the structures included a cold storage and freezer facility. The chosen comparables varied in size from 11,600 square feet to 204,603 square feet, and the prices ranged from $13.43 to $24.76 per square foot. The one comparable structure improved with cold storage and freezer facilities had approximately 8.8 percent of its square footage in cooler and freezer space, as compared with the approximate 33 percent of the subject property dedicated to such functions. After adjusting for such differences as the time of sale, the ratio of land to building area, size, age, condition, clear height, potential uses, office *86 portion, and special improvements, Mr. Haley concluded that based on the market data approach the Cabot Road property had a fair market value on January 11, 1977, of $520,000.
To gather information for his appraisal under the income approach, Mr. Haley surveyed nine existing leases and two lease listings on buildings within the Cabot, Cabot & Forbes Park. The leased structures ranged in size from 4,812 square feet to 48,384 square feet, and their rental rates were between 14.5 cents per square foot to 22.6 cents per square foot. None of the leased properties Mr. Haley used as comparables contained cold storage facilities. After taking into account the lease information and making adjustments for dates of leases, size, location, building amenities, and lease terms, Mr. Haley concluded that the economic rent of the subject property, including the cooler and freezer areas, was 16 cents per square foot, or $3,952 per month, for a total of $47,424 per annum. Mr. Haley then adjusted this amount for potential vacancy loss, management and leasing fees, and maintenance fees, and he determined the net income on the subject building and land to be $38,830 per year. Mr. Haley then chose a *87 capitalization rate of 8.8 percent based upon capitalization rates of other buildings in the vicinity. On this basis, Mr. Haley computed the fair market value of the subject property to be $441,250. Next Mr. Haley determined the appropriate additional rental rates for the subject's cooler and freezer facilities by comparing them to facilities contained in a number of other buildings in the Cabot, Cabot & Forbes Park. Mr. Haley's analysis resulted in an estimation of an additional fair rental value of 10 cents per square foot for the 8,100 square feet of cooler and freezer facilities. This determination resulted in an additional annual rental value of $9,720 per year. Mr. Haley adjusted this figure to account for potential vacancies, and management and leasing commissions, which computations resulted in a total net additional income of $8,602 per annum. Mr. Haley anticipated that the maximum freezer and cooler life would be 15 years, and therefore he amortized the net additional income per year at 10 percent to determine a total additional market value of $65,427 for the cooler and freezer facilities.By adding the $441,250 appraised value of the land and building to the values *88 for the freezer and cooler improvements, Mr. Haley determined that under the income approach the fair market value of the Cabot Road property on January 11, 1977, would approximate $505,000. In correlating the market data approach and the income approach, Mr. Haley concluded that the fair market value of 465 Cabot Road on January 11, 1977, was $510,000. This determination was based upon Mr. Haley's opinion that the income approach was the better indicator of the fair market value of the subject property. While Mr. Gimmy utilized the market data and income approaches to the valuation of the 465 Cabot Road property, he considered the property a special purpose property, and he valued it accordingly. Pursuant to the income approach Mr. Gimmy analyzed the existing lease as modified by the cost of living adjustment effective October 1, 1977. That adjustment provided for under paragraph 29 of the lease resulted in a monthly rental of $7,000, and Mr. Gimmy considered that amount to closely reflect the rent that an investor feasibly might receive from the property as of January 11, 1977. Based upon the $7,000 per month rental, Mr. Gimmy determined that the gross income from the property *89 would be $84,000 per year, and when adjusted for vacancy and collection loss, and expenses of maintenance, reserves, and management, the net annual income would be $79,350. Mr. Gimmy chose a capitalization rate of 11.5 percent due to the special purpose nature of the improvements, and he applied this to the net rental income. As a result, Mr. Gimmy appraised the value of the property based on its fair rental value on January 11, 1977, at $690,000. After researching the sales of light industrial properties within the Cabot, Cabot & Forbes Park, Mr.Gimmy concluded that those properties were not comparable to the subject property. He found that facilities truly comparable to the Cabot Road property were scarce. Mr. Gimmy obtained information on sales of two cold storage warehouses in southern California, which he considered to be more comparable to the subject property than the properties in the Cabot, Cabot & Forbes Park. Those two sales, which occurred in 1977, ranged in price from $26.30 per square foot to $29.98 per square foot of building area. At trial Mr. Gimmy indicated that the refrigeration areas of one of these structures were 33 percent of its total area, that 5 percent *90 of the total area was freezer space, and the remaining 62 percent was office and warehouse area. Despite the disparate geographical locations of these two cold storage warehouses as compared to the subject property, Mr. Gimmy determined that the Cabot Road property probably could have been sold on January 11, 1977, for $27 per square foot of building area, excluding the mezzanine.Mr. Gimmy excluded the mezzanine square footage because he was of the opinion that it contributed only marginally to the building's utility. Therefore, by applying the $27 per square foot to the 24,246 square feet remaining in the building, Mr. Gimmy concluded that the building was wroth $655,000 as of January 11, 1977. Mr. Gimmy then valued the land pursuant to prices for which comparable lots in the Cabot, Cabot & Forbes Park were selling. Mr. Gimmy concluded that the 69,680 square feet of land was worth approximately $3 per square foot, for a total of $210,000. Mr. Gimmy also utilized a valuation service to determine the replacement cost of the subject structure. He determined that under the replacement cost approach, the land and improvements would be valued at $747,000. In reconciling the values *91 indicated by the different pricing approaches, Mr. Gimmy indicated that any potential investor would consider each of these approaches to have validity. However, he was of the opinion that an investor would give primary consideration to the income approach, and therefore Mr. Gimmy appraised 465 Cabot Road to have a fair market value of $690,000 on January 11, 1977. Respondent argues that Mr. Haley incorrectly ignored the existence of a lease of the property, and that the proper value thereof exceeded Mr. Haley's appraisal. Respondent further states that Mr. Haley's approach was incorrect in that the Sonoma Mission Creamery Company was a good risk debtor and a profitable business at the date of valuation. Respondent notes that although Sonoma Mission Creamery Company was liquidated after decedent's date of death, Mr. Haley should not have used this hindsight in order to determine the value of property on decedent's date of death. Respondent also asserts that Mr. Haley chose "comparables" which were not actually comparable to the subject property and that Mr. Haley's choice of capitalization rates was inappropriate. Petitioners assert that Mr. Gimmy's approach to valuing the *92 business as a cold storage plant was not valid. They state that the facility was hybrid in nature and included refrigeration space plus work areas. Petitioners note that Mr. Gimmy's appraisal report contained no comparables on rental data although Mr. Gimmy chose to make a valuation according to the income method. In essence, petitioners contend that Mr. Gimmy's report was inaccurate. Petitioners also contend that the lease and its addenda were not negotiated at arm's length and therefore should not be utilized at face value. Considering the evidence as a whole, we conclude that the fair market value of the Cabot Road property can best be determined by using Mr. Gimmy's capitalization of actual rent approach but with the $5,800 per month rent in effect of January 11, 1977. Although the rent was due for a cost of living adjustment in September or October of 1977, the amount of such adjustment was speculative at January 11, 1977. Mr. Gimmy's adjustment for vacancy and collections loss and expenses of maintenance, reserves and management was small, being only about 5.5 percent. The justification for such a small adjustment is the existing lease on the property. However, he *93 have accepted this 5.5 percent vacancy and expense rate because of the existing lease and have accepted Mr. Gimmy's 11.5 percent capitalization rate which is high to account for the special usage nature of the facility. Accepting Mr. Gimmy's method but using the actual January 11, 1977, rent of the property we arrived at a fair market value of the Cabot Road property as of January 11, 1977, of $572,000. Based on all of the evidence in the record, we conclude that the property located at 465 Cabot Road had a fair market value as of January 11, 1977, of $572,000. Because decedent owned a one-half interest in the Cabot Road property, the value of her interest at her death was $286,000. Decision will be entered under Rule 155. Footnotes
1. On brief petitioner contends that the proper values of decedent's interests in these properties as of January 11, 1977, are as follows: 1125B Sir Frances Drake
Boulevard
$185,000
724 Battery Street
119,000
465 Cabot Road
230,000
In his statutory notice of deficiency respondent determined a deficiency of $81,315 by valuing decedent's interest as follows: The undivided one-quarter interest in 1125B Sir Francis Drake Boulevard at $267,500; decedent's undivided one-half interest in 724 Battery Street at $163,900; and decedent's undivided one-half interest in 465 Cabot Road at $420,000. In an Amendment to Answer, respondent alleged that the value on January 11, 1977, of decedent's undivided one-half interest in 724 Battery Street was $320,000 and on this basis claimed an increased deficiency of $52,614, making the total deficiency in issue $133,929. OPINION The issue here is the value on January 11, 1977, of undivided interests in three parcels of real estate held by decedent at the time of her death. In approaching the issue both parties have valued the entire properties. However, they disagree as to whether the value of decedent's interests in the properties is to be determined to be her proportionate interests in the entire properties. Petitioners contend that a discount should be applied because the interests owned by decedent were undivided interests. It is generally accepted that the fair market value of property is the price at which it would change hands "after negotiation, between a willing buyer and a willing seller, both being informed and neither being under compulsion to buy or sell." Portland Manufacturing Co. v. Commissioner,56 T.C. 58, 79-80 (1971); section 20.2031-1(b), Estate Tax Regs. The first property to be valued is located at 1125B Sir Francis Drake Boulevard, Kentfield, California. This site, composed of 74,555 square feet, is improved with a one-story, wood-frame structure originally constructed in 1963 as a convalescent hospital. Mr. Reese, Mrs. Reese, Ms. Giusti, and decedent purchased the Sir Francis Drake property in 1962. In January 1973 the subject property was leased to Smokers Deconditioning Clinic, Inc. d/b/a Western Rehabilitation Centers II, which has used the building as a rehabilitation hospital. The parties agree that the highest and best use for the Sir Francis Drake property is as a rehabilitation hospital. The expert witness of each party valued the Sir Francis Drake property in accordance with this stated highest and best use. William C. Haley, the appraiser for petitioners, valued the Sir Francis Drake property at $825,000. Arthur E. Gimmy, appraiser for respondent, valued the subject property at $1 million. The parties agree that the $1,100,000 for which the lessee had an option to purchase the property as of January 11, 1977, is the upper limit that a prospective purchaser would pay for the subject property on that date. In determining the January 11, 1977, fair market value of the subject property, Mr. Haley utilized two commonly accepted appraisal methods--the market data (comparison) approach and the income approach. To calculate the value under the market data approach Mr. Haley gathered data on sales of eight convalescent and rehabilitation hospitals located in northern California and of one hospital located in Anaheim, California. The sales cited by Mr. Haley occurred after September 1970, with three of the nine sales taking place within one year of the January 11, 1977, valuation date. The sales prices ranged between $471,000 and $3,525,000; calculated on a per bed basis, these sales prices ranged from $6,128 to $10,809 per licensed bed. Mr. Haley then compared the nine sales properties to the subject property and adjusted the figures for differences in size, age, quality and condition of improvements, location, reputation, accessibility, and future potential. Mr. Haley concluded that the value of the Sir Francis Drake property as determined by the market data approach was $815,000, or $8,250 per licensed bed. Mr. Haley also utilized the income approach to analyze the potential net annual return on invested capital which might be produced by the Sir Francis Drake property. In making this determination Mr. Haley utilized rental data on other convalescent and rehabilitation hospitals. Each of these facilities used as comparisons by Mr. Haley contained between 33 and 194 beds, and, as expressed as a unit price per licensed bed, the monthly rental rate returned from $72 to $85. Mr. Haley analyzed this leasing information and concluded that the fair rental value of the 99-bed subject facility was $89,100 per year. Based on a capitalization rate of 10.75 percent, which Mr. Haley calculated as a result of comparing the subject property to other labor intensive convalescent and rehabilitation hospitals with capitalization rates ranging from 10.25 percent to 12 percent, Mr. Haley judged that pursuant to the income approach the appraised value on January 11, 1977, of the Sir Francis Drake property was $830,000. In correlating the results of the two approaches, Mr. Haley took note of the Option to Purchase, but he discarded the $1,100,000 purchase option price effective on January 11, 1977, as having little or no bearing on the fair market value of the property. Mr. Haley viewed this purchase option price as an arbitrary price set by the lessors and lessee in 1973. Mr. Haley finally concluded that supported by the two valuation approaches the January 11, 1977, fair market value of the Sir Frances Drake property was $825,000. Mr. Gimmy, respondent's expert, used the same two methods in appraising the value of the Sir Francis Drake property. His appraisal made pursuant to the market approach resulted in a value of $990,000. Mr. Gimmy recognized that the facility contained 99 licensed beds and estimated the sales price at $10,000 per bed. To reach this conclusion, Mr. Gimmy utilized data that he had gathered on sales of two convalescent hospitals and of one general hospital located in California. Pursuant to the income approach, Mr. Gimmy analyzed the rental structure of the subject property. Mr. Gimmy noted that the Sir Francis Drake property was leased in 1973 for a 20-year term and that on January 11, 1977, the rent was payable at a rate of $7,570 per month. Yet Mr. Gimmy believed that the $7,570 rental was below the property's fair rental value. Becuase the rent was scheduled to increase in January 1978 to $8,065 per month and Mr. Gimmy viewed this amount as "more indicative of the rental value of the subject facility," he utilized this amount in appraising the subject property. Mr. Gimmy chose to capitalize this rental value at a rate of 9 percent. This choice was based on such factors as the ratio of square footage per bed, the number of licensed surgical/medical beds, the number of therapy rooms similar to those found in general hospitals, the number of beds comparable to those found in skilled nursing homes, the location of the subject property in relationship to other hospitals, and the low rental paid per bed. Mr. Gimmy determined that the gross annual income from the Sir Francis Drake property was subject to a 2 percent vacancy and collection loss as well as a 2 percent management fee. He also deducted $5,660 as the remaining value of the leasehold interest. The result of Mr. Gimmy's income approach calculation was a property value of $1,020,000. After correlating the income and market data approaches, Mr. Gimmy concluded that the fair market value of the Sir Francis Drake property on January 11, 1977, was $1 million. Respondent attacks Mr. Haley's approach to valuation of the Sir Francis Drake property for his failure to inspect some of the purported comparable hospital facilities, his lack of understanding of the difference between an intermediate care facility and a skilled nursing facility, his lack of timely information with regard to sales of comparable facilities, and his failure to investigate the leases of the claimed comparables. On the other hand, petitioners assert that Mr. Gimmy manipulated the figures, particularly the capitalization rate, to make his valuation determination. Petitioners also contend that Mr. Gimmy disregarded the fair rental value applicable on January 11, 1977, and instead applied the rental value applicable as of 1978. Petitioners contend that the data submitted by Mr. Haley was more comprehensive and unbiased. After a review of the entire record, we conclude that the sales used by each expert as alleged comparable sales in valuing the Sir Francis Drake property are so dissimilar to the property being valued as to be of little assistance in determining the fair market value. In our view the best available method of valuing the property is that used by each expert based on the computed rental amount of the property. Mr. Gimmy computed value on the basis of the $8,065 monthly rent, which would become effective in 1978, capitalized at 9 percent. Instead, if the actual rental as of January 11, 1977, of $7,570 per month or $90,840 per year is capitalized at 10 percent, the resulting value is $908,400. Mr. Haley computed a yearly rental of $89,100 which he capitalized at 10.75 percent. If this yearly rental is capitalized at 10 percent, the resultant value is $891,000. In our view for some of the reasons pointed out by respondent the capitalization rate of 10.75 percent used by petitioner's expert is too high, and for some of the reasons pointed out by petitioner the rate of 9 percent used by respondent's expert is too low. From the evidence as a whole we conclude that a 10 percent capitalization rate is more appropriate than the rate used by either expert. Considering the values reached when this 10 percent rate is applied to the yearly rentals as provided for in the lease and the rental as computed by etitioner's expert, we conclude that the fair market value of the Sir Francis Drake property on January 11, 1977, is $900,000. Having determined the value of the entire property, it is necessary to find the value of the one-quarter undivided interest in the subject property owned by decedent at the date of her death. Mr. Gimmy valued decedent's interest in all of the subject properties in accordance with her aliquot portions of the properties. While the first step in Mr. Haley's determination of the fair market value of decedent's interestswas a division of the subject properties' fair market values by the fractional interests which decedent owned, he then applied a 10 percent discount factor to reduce the values. Section 2033, I.R.C. 1954, Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the year in issue.
[2] provides that the "value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Since under section 2033 the value to be determined is the value of the decedent's interest in the property, an appraisal of a property's full fair market value is only the initial step if the decedent's interest is a fractional interest. In this case the interest held by decedent at the date of her death in each of the properties here involved was an undivided interest. It is this undivided interest that we must value. See Porter, Transferee v. Commissioner,49 T.C. 207, 219-220 (1967). Whether the values of the decedent's undivided interests in the properties are the amounts arrived at by dividing the properties' fair market values by the decedent's absolute proportionate interests therein is a question of fact. In appropriate circumstances it well may be that a discount factor should be applied to account for a proven reduced value that an undivided interest might have if the interest were sold on the open market. See Estate of Campanari v. Commissioner,5 T.C. 488↩ (1945), for discussion of evidence tending to prove value of an undivided interest. 3. Both parties discuss the possibility of what they refer to as a "forced sale" of an undivided interest. Obviously the value we are to determine is a sale between a willing buyer and a willing seller. If the parties are referring to the possibility that a disagreement might arise between the joint owners resulting in the necessity of one joint owner either selling his interest or the entire property being sold, they have not shown that either sale would necessarily be a "forced sale." As above stated, petitioners have failed to prove that the fair market value of decedent's undivided interests in the properties here involved would be other than the aliquot portions of the values of the entire properties.↩
4. The computation is-- 10,552 square feet (nonbasement space) X $30 = $316,560 5,500 square feet (basement space) X 25 = 137,500 Total $454,060 Rounded to $454,000↩